**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
  *Plaintiff-Appellant*,

  v.

ERIC EUGENE LUNDIN, AKA
Whitey,

  *Defendant-Appellee.*

No. 14-10365

D.C. No.
4:13-cr-00402-
JST-1

OPINION

Appeal from the United States District Court
for the Northern District of California
Jon S. Tigar, District Judge, Presiding

Argued and Submitted
September 18, 2015—San Francisco, California

Filed March 22, 2016

Before: William A. Fletcher, Marsha S. Berzon,
and Carlos T. Bea, Circuit Judges.

Opinion by Judge W. Fletcher

**SUMMARY**[*]

**Criminal Law**

In an interlocutory appeal by the government, the panel affirmed the district court's order suppressing handguns seized from the defendant's home, and remanded for further proceedings.

The panel held that the warrantless search of the defendant's home was not justified by exigent circumstances. The panel explained that the "knock and talk" exception to the warrant requirement does not apply when officers encroach upon the curtilage of a home with the intent to arrest the occupant. The panel saw no reason to disturb the district court's finding that the officers' purpose in knocking on the defendant's door at 4:00 a.m., in response to a deputy's request that the defendant be arrested, was to find and arrest him. The panel held that the officers therefore violated the defendant's Fourth Amendment right to be free from unlawful searches when they stood on his porch and knocked on his front door. Since this unconstitutional conduct caused the allegedly exigent circumstance— crashing noises in the backyard—the panel concluded that that circumstance cannot justify the search resulting in the seizure of the handguns.

The panel held that the warrantless search was not justified as a protective sweep, because the officers lacked a reasonable ground for believing that there was a danger that would have justified the sweep of the defendant's home.

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

The panel held that the inevitable discovery exception to the exclusionary rule does not apply, because the officers knew they had probable cause to arrest the defendant but failed to obtain any warrant before coming onto his porch and knocking on his door with the intention of arresting him.

## COUNSEL

Barbara J. Valliere (argued), Chief, Appellate Division, and Melinda Haag, United States Attorney, San Francisco, California, for Plaintiff-Appellant.

Geoffrey A. Hansen (argued), Chief Assistant Federal Public Defender, Steven G. Kalar, Federal Public Defender, and Steven J. Koeninger, Research and Writing Attorney, San Francisco, California, for Defendant-Appellee.

## OPINION

W. FLETCHER, Circuit Judge:

Around 4:00 a.m. on April 23, 2013, three northern California law enforcement officers approached Defendant Eric Lundin's home without either an arrest warrant or a search warrant. They came onto his front porch and knocked on his door with the intent of arresting him. From the front porch where they were standing, the officers heard crashing noises coming from the back of the house. They ran to the back, ordered Lundin to come out of the fenced-in backyard, and arrested him. After putting Lundin in a patrol car, several officers briefly searched Lundin's home, including the back patio where they found two handguns in open view. The

district court suppressed the handguns as the result of an illegal search. The United States appeals. We hold that the officers violated the Fourth Amendment when they knocked on the door at 4:00 a.m. without a warrant with the intent of arresting Lundin, and that the immediately ensuing search was illegal. We therefore affirm.

## I. Background

At 12:24 a.m. on April 23, 2013, Deputy Sheriff Scott Aponte of the Humboldt County Sheriff's Office ("HCSO") was dispatched to the Mad River Community Hospital to interview Susan Hinds, a 63-year-old patient who claimed she had been kidnapped several hours earlier. In a tape-recorded statement, Hinds told Deputy Aponte that sometime after 8:00 p.m. on April 22, shortly after her son, Joseph Miller, had left to go to the store, Eric "Whitey" Lundin knocked on the door of her mobile home. When Hinds opened the door, Lundin grabbed her by the neck, forced his way inside, and accused Miller of stealing marijuana from him.

Hinds told Deputy Aponte that, once inside the mobile home, Lundin took two firearms from his pockets — a compact silver handgun and a large black handgun. He then took out a bottle of pills and forced Hinds to ingest one of the pills. He described the pills to Hinds as "methadone" and told her that they were the easiest way to overdose. After forcing Hinds to ingest the pill, Lundin broke her television by striking it with one of the handguns. Lundin then pressed the black handgun against Hinds's temple and forced her to call Miller to tell him to come home. When the call ended, Lundin snatched Hinds's cell phone and threw it across the room.

Hinds told Deputy Aponte that Lundin repeatedly said that she was going to die and that, as a member of the Mongols motorcycle gang, he does not "leave witnesses." Lundin received two calls on his cell phone while still at the mobile home. Hinds heard him say during one of the calls, "I'm taking care of it. I've got her right here on the couch."

Hinds said that Lundin then forced her into his Dodge truck. They passed Miller as they drove out of the mobile home park. Lundin told Hinds, "Wave good-bye to your son. You'll never see him again." During the drive, Lundin forced Hinds to ingest two more pills and pointed out locations where he could safely dispose of her body. Lundin then spoke with Miller on his cell phone and accused Miller of stealing his marijuana. After ending the call with Miller, Lundin told Hinds that he no longer believed Miller had stolen his marijuana. Lundin drove Hinds back to her mobile home, told her that he only meant to scare her, and warned her not to call the police. He told her that he would buy her a new television. Hinds had been in the truck a total of about fifteen minutes.

After concluding the interview with Hinds at the hospital, Deputy Aponte interviewed Miller, who had come to the hospital to see his mother. Miller told Aponte that Hinds had called him while he was at the grocery store and had told him to come home immediately. When he returned, the mobile home was in disarray, and the television was broken. Miller then called Lundin on his cell phone. Miller recounted to Aponte that Lundin had accused him of stealing marijuana and had told him that Lundin was going to send his "Mongol brothers" to get Miller. After concluding the interview with Miller, Aponte visited Hinds's mobile home to photograph the damage.

Deputy Aponte asked dispatch to issue a "Be On the Look Out" ("BOLO") for Lundin and a request for Lundin's arrest under California Penal Code § 836. Section 836 authorizes a warrantless arrest when there is probable cause to believe a suspect has committed a felony. However, § 836 does not — because it may not — authorize a warrantless arrest of a suspect in his own home. *Payton v. New York*, 445 U.S. 573, 589–90 (1980). Aponte believed there was probable cause to arrest Lundin for burglary, false imprisonment, kidnapping, vandalism, brandishing a firearm, administering a drug to commit a felony, administering a controlled substance, and battery. HCSO dispatch issued the BOLO and arrest request just before 2:00 a.m.

Upon receiving the BOLO and arrest request, Arcata Police Department ("APD") Officer Matthew O'Donovan used vehicle registration files to determine Lundin's address. O'Donovan then drove to Lundin's home. When he arrived, he saw a vehicle matching the description of Lundin's Dodge truck parked in the driveway and saw that lights were on inside the house. O'Donovan called for backup. APD Officer Jeremiah Kasinger, APD Sergeant Keith Altizer, and HCSO Deputy Matthew Tomlin responded to the call, arriving just before 4:00 a.m.

Officer O'Donovan wrote in a declaration that he, Officer Kasinger, and Deputy Tomlin approached Lundin's front door. O'Donovan wrote that without identifying themselves they stood on the porch, knocked loudly, waited thirty seconds for an answer, and then knocked more loudly. After the second knock, the officers heard several loud crashing noises coming from the back of the house. The officers ran to the back of the house and heard someone moving around in the backyard. The officers identified themselves and

ordered Lundin "to put his hands in the air and come out slowly." When Lundin did so, Tomlin handcuffed him and placed him in a patrol car.

Officers O'Donovan and Kasinger then searched Lundin's backyard and patio, which were enclosed by a high fence. They also searched inside the house. At the end of the search, O'Donovan saw on the patio, in open view and within arm's reach of a common walkway, a clear plastic freezer bag containing a silver revolver and a black semiautomatic handgun. The bag was lying admidst a number of five-gallon buckets that had been knocked over. The crashing noises heard by the officers had likely been the buckets falling over. O'Donovan notified Deputy Tomlin that he had found a bag containing handguns, which Tomlin then photographed and seized. When Deputy Aponte arrived, he confirmed that the handguns matched Hinds's description of the guns used during the earlier incident. Aponte then advised Lundin of his *Miranda* rights.

On the morning of April 24, HCSO Deputy Todd Fulton prepared an affidavit, statement of probable cause, and an application for a warrant to search Lundin's home. The statement of probable case described Hinds's report to Deputy Aponte and stated, inter alia, that two firearms had been located during the arrest at Lundin's residence. A California magistrate judge approved the warrant. At about 10:30 a.m. that morning, state and federal law enforcement officers executed the warrant and seized numerous items from inside the house, including guns, cell phones, a prescription pill bottle for methadone, computers and hard drives, and various Mongols paraphernalia.

On June 20, Lundin was charged with being a felon in possession of a firearm and ammunition in violation of 18 U.S.C. § 922(g)(1). Lundin moved to suppress the evidence obtained from the patio and inside the house, as well as statements he had made before he was read his *Miranda* rights. Lundin contended that the two handguns seized from the patio on April 23 should be suppressed as the fruits of an unreasonable warrantless search, that the evidence seized from his house on April 24 should be suppressed as the fruits of an invalid search warrant, and that the pre-warning information elicited by officers should be suppressed under *Miranda*. On June 26, the district court suppressed the two handguns seized on the patio. It otherwise denied Lundin's motion.

On July 24, a grand jury returned a superseding indictment charging Lundin with kidnapping in aid of racketeering (18 U.S.C. § 1959(a)(1)), assault in aid of racketeering (18 U.S.C. § 1959(a)(3)), kidnapping (18 U.S.C. § 1201(a)(1)), possession with intent to distribute and manufacture marijuana (21 U.S.C. §§ 841(a)(1), (b)(1)(C)), use or possession of a firearm in furtherance of a crime of violence or a drug trafficking crime (18 U.S.C. § 924(c)(1)), and being a felon in possession of a firearm (18 U.S.C. § 922(g)(1)). On July 25, after Lundin was arraigned on new charges, the government timely took an interlocutory appeal under 18 U.S.C. § 3731.

## II. Standard of Review

"Whether the exclusionary rule applies to a given case is reviewed de novo, while the underlying factual findings are reviewed for clear error." *United States v. Perea-Rey*, 680 F.3d 1179, 1183 (9th Cir. 2012) (citation omitted). "We

review the district court's application of the inevitable discovery doctrine for clear error because, although it is a mixed question of law and fact, it is essentially a factual inquiry." *United States v. Reilly*, 224 F.3d 986, 994 (9th Cir. 2000); *see United States v. Ruckes*, 586 F.3d 713, 716 (9th Cir. 2009); *United States v. Lang*, 149 F.3d 1044, 1048 (9th Cir. 1998).

## III.  Discussion

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures . . . ." U.S. Const. amend. IV.  "At [its] very core stands the right of a [person] to retreat into his own home and there be free from unreasonable governmental intrusion." *Silverman v. United States*, 365 U.S. 505, 511 (1961).  "[S]earches and seizures inside a home without a warrant are," therefore, "presumptively unreasonable."  *Payton*, 445 U.S. at 586. Evidence derived from an illegal search cannot "constitute proof against the victim of the search." *Wong Sun v. United States*, 371 U.S. 471, 484 (1963).

It is undisputed that the officers seized the two handguns during a warrantless search of Lundin's home.  The handguns are therefore the product of a presumptively unreasonable search.  To avoid suppression of the handguns, the government must demonstrate that either an exception to the warrant requirement or an exception to the exclusionary rule applies.  The government argues that the warrantless search of Lundin's home was justified either due to exigent circumstances or as a protective sweep. In the alternative, the government contends the handguns are admissible under the

inevitable discovery exception to the exclusionary rule. We agree with the district court that these arguments fail.

## A. Exigent Circumstances

Law enforcement officers may conduct a warrantless search of a home when "the exigencies of the situation make the needs of law enforcement so compelling that [a] warrantless search is objectively reasonable under the Fourth Amendment." *Kentucky v. King*, 563 U.S. 452, 460 (2011) (alteration in original) (citation omitted). However, exigent circumstances cannot justify a warrantless search when the police "create the exigency by engaging . . . in conduct that violates the Fourth Amendment." *Id.* at 462.

The officers in this case had no reason other than the crashing noises coming from the backyard to believe that there were exigent circumstances justifying a warrantless search of Lundin's home. However, the evidence shows that the officers' knock at Lundin's front door caused him to make the crashing noises. Thus, to show that exigent circumstances justified the warrantless search, the government must show that the officers lawfully stood on Lundin's front porch and knocked on his door.

The area "immediately surrounding and associated with the home" — the "curtilage" — is treated as "part of [the] home itself for Fourth Amendment purposes." *Oliver v. United States*, 466 U.S. 170, 180 (1984). Like searches and seizures inside the home itself, "searches and seizures in the curtilage without a warrant are also presumptively unreasonable." *Perea-Rey*, 680 F.3d at 1184. The presumption against warrantless searches and seizures "would be of little practical value if the State's agents could stand in

a home's porch or side garden and trawl for evidence with impunity." *Florida v. Jardines*, 569 U.S. —, —, 133 S. Ct. 1409, 1414 (2013).

A government agent conducts a "search" within the meaning of the Fourth Amendment when the agent infringes "an expectation of privacy that society is prepared to consider reasonable," *United States v. Jacobsen*, 466 U.S. 109, 113 (1984), or "physically occupie[s] private property for the purpose of obtaining information." *United States v. Jones*, 565 U.S. —, —, 132 S. Ct. 945, 949 (2012). It is undisputed that the officers physically occupied the curtilage of Lundin's home when they stood on the front porch and knocked on his door. Indeed, the front porch of a home is the "classic exemplar" of curtilage. *Jardines*, 133 S. Ct. at 1415. The district court concluded that the officers' clear purpose was to determine whether Lundin was home and, if so, to arrest him. Thus, the officers' presence on Lundin's front porch and their knock at his door constituted a presumptively unreasonable search.

The government contends that the officers were permitted to knock on Lundin's door under the so-called "knock and talk" exception to the warrant requirement, which permits law enforcement officers to "'encroach upon the curtilage of a home for the purpose of asking questions of the occupants.'" *Perea-Rey*, 680 F.3d at 1187 (quoting *United States v. Hammett*, 236 F.3d 1054, 1059 (9th Cir. 2001)). The "knock and talk" exception resembles to some degree the exception for consensual searches. The relevant "consent" in a "knock and talk" case is implied from the custom of treating the "knocker on the front door" as an invitation (*i.e.*, license) to approach the home and knock. *Jardines*, 133 S. Ct. at 1415 (citation omitted). The scope of the exception is coterminous

with this implicit license. Stated otherwise, to qualify for the exception, the government must demonstrate that the officers conformed to "'the habits of the country,'" *id.* (quoting *McKee v. Gratz*, 260 U.S. 127, 136 (1922) (Holmes, J.)), by doing "'no more than any private citizen might do,'" *id*. at 1416 (quoting *King*, 563 U.S. at 469). In the typical case, if the police do not have a warrant they may "approach the home by the front path, knock promptly, wait briefly to be received, and then (absent invitation to linger longer) leave." *Id.* at 1415. For two reasons, we agree with the district court that the officers exceeded the scope of the customary license to approach a home and knock.

First, unexpected visitors are customarily expected to knock on the front door of a home only during normal waking hours. This does not mean that the "knock and talk" exception never applies when officers knock on the door of a home in the early morning. In some circumstances, an early morning visit may be "consistent with an attempt to initiate consensual contact with the occupants of the home." *Perea-Rey*, 680 F.3d at 1188. For example, officers may have reason to believe that the resident in question generally expects strangers on his porch early in the morning — perhaps he sells fresh croissants out of his home. Or the officers may have a reason for knocking that a resident would ordinarily regard as important enough to warrant an early morning disturbance — perhaps a fox has gotten into the resident's henhouse. Here, however, the officers knocked on Lundin's door around 4:00 a.m. without evidence that Lundin generally accepted visitors at that hour, and without a reason for knocking that a resident would ordinarily accept as sufficiently weighty to justify the disturbance. Indeed, the officers here acted for a purpose that virtually no resident would willingly accept.

Second, the scope of a license is often limited to a specific purpose, *Jardines*, 133 S. Ct. at 1416, and the customary license to approach a home and knock is generally limited to the "purpose of asking questions of the occupants," *Perea-Rey*, 680 F.3d at 1187 (citation omitted). Officers who knock on the door of a home for other purposes generally exceed the scope of the customary license and therefore do not qualify for the "knock and talk" exception.

"Reasonableness" under the Fourth Amendment "is predominantly an objective inquiry." *Ashcroft v. al-Kidd*, 563 U.S. 731, —, 131 S. Ct. 2074, 2080 (2011) (citation omitted). A court's task is usually to determine only "whether the circumstances, viewed objectively, justify [the challenged] action." *Id.* (alteration in original) (citation omitted). However, the Supreme Court has recognized several "limited exception[s]" to this general rule, where "actual motivations" matter. *Id.* (alteration in original) (citation omitted). For example, police do not need a judicial warrant or probable cause to conduct a search or seizure that is justified by "special needs," *see, e.g.*, *Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 665 (1995) (deterring drug use in public schools), or to conduct an administrative inspection, *see, e.g.*, *Michigan v. Clifford*, 464 U.S. 287, 294 (1984) (authorizing fire inspection).

Before *Jardines*, it was not clear whether the proper application of the "knock and talk" exception is an entirely objective inquiry, or whether, as in special-needs-search and administrative-inspection cases, the actual motivation of the officers matters. The Court answered the question in *Jardines*, explaining that the scope of the license to approach a home and knock "is limited not only to a particular area but also to a *specific purpose*." 133 S. Ct. at 1416 (emphasis

added).   That is, the application of the "knock and talk"
exception ultimately "depends upon whether the officers
ha[ve] an implied license to enter the [curtilage], which in
turn depends upon the *purpose* for which they enter[]." *Id*. at
1417 (emphasis added).  After *Jardines*, it is clear that, like
the special-needs and administrative-inspection exceptions,
the "knock and talk" exception depends at least in part on an
officer's subjective intent.

The "knock and talk" exception to the warrant
requirement does not apply when officers encroach upon the
curtilage of a home with the intent to arrest the occupant.
Just as "the background social norms that invite a visitor to
the front door do not invite him there to conduct a search," *id.*
at 1416, those norms also do not invite a visitor there to arrest
the occupant.  We do not hold that an officer may never
conduct a "knock and talk" when he or she has probable
cause to arrest a resident but does not have an arrest warrant.
An officer does not violate the Fourth Amendment by
approaching a home at a reasonable hour and knocking on the
front door with the intent merely to ask the resident questions,
even if the officer has probable cause to arrest the resident.

In this case, however, Deputy Aponte had asked dispatch
to broadcast a request that Lundin be arrested.  The officers
who arrived at Lundin's home were responding to that
request.  Rather than obtain a warrant or wait for a time of
day when strangers might ordinarily visit, the officers
approached Lundin's door at about 4:00 a.m. without a
warrant, immediately after they arrived at his home.  Based
on this evidence, the district court found, as a matter of fact,
that the officers' purpose in knocking on Lundin's door was
to find and arrest him, and we see no reason to disturb that
finding.   Thus,   the   officers   violated   Lundin's   Fourth

Amendment right to be free from unlawful searches when they stood on his porch and knocked on his front door. And since this unconstitutional conduct caused the allegedly exigent circumstance — the crashing noises in the backyard — that circumstance cannot justify the search resulting in the seizure of the two handguns.

We note that our decision in *United States v. Vaneaton*, 49 F.3d 1423 (9th Cir. 1995), may be on infirm ground after *Jardines*. In *Vaneaton*, officers had probable cause to arrest the defendant for receiving stolen property and for violating his parole, and they had reason to believe that he was staying at the Rainbow Motel. *Id.* at 1425. The officers approached the defendant's motel room, knocked on the door, and arrested him when he opened the door. *Id.* Our opinion did not expressly note the officers' purpose in knocking on the defendant's door, but it is fairly clear from our description of the facts that they intended to arrest him. Although the defendant was standing inside the doorway of his room, we held that the officers lawfully arrested him because he "'voluntarily exposed himself to warrantless arrest' by freely opening the door of his motel room to the police." *Id.* at 1426 (quoting *United States v. Johnson*, 626 F.2d 753, 757 (9th Cir. 1980)).

Unlike the officers in *Jardines* and in this case, the officers in *Vaneaton* were standing in the common space of a motel when they knocked, rather than in the curtilage of a home. We therefore have no need to overrule *Vaneaton*. *See Miller v. Gammie*, 335 F.3d 889, 899–900 (9th Cir. 2003) (*en banc*) (holding that "a three-judge panel is free to reexamine the holding of a prior panel" when the Supreme Court has "undercut the theory or reasoning underlying the prior circuit precedent in such a way that the cases are clearly

irreconcilable"). Whether *Vaneaton* remains good law after *Jardines* is therefore a question for another case and another day.

## B.  Protective Sweep

The protective sweep doctrine authorizes "quick and limited" warrantless inspections "of those spaces where a person may be found" when "there are articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbor[ed] an individual posing a danger to those on the arrest scene." *United States v. Lemus*, 582 F.3d 958, 962 (9th Cir. 2009) (citation omitted) (alteration in original).  In this case, the officers had no "reasonable, articulable suspicion" that anyone other than Lundin was present at his residence.  *Maryland v. Buie*, 494 U.S. 325, 336 (1990).  Thus, the only plausible threat to the safety of those on the scene was Lundin himself.  By the time the officers conducted the sweep of Lundin's home, however, he had already been handcuffed and placed in a police vehicle.  Thus, the officers lacked a reasonable ground for believing that there was a danger that would have justified the sweep of Lundin's home.

## C.  Inevitable Discovery

The inevitable discovery exception does not apply when officers have probable cause to apply for a warrant but simply fail to do so.  *See United States v. Mejia*, 69 F.3d 309, 320 (9th Cir. 1995); *United States v. Echegoyen*, 799 F.2d 1271, 1280 n.7 (9th Cir. 1986).  The government erroneously suggests our decision in *United States v. Merriweather*, 777 F.2d 503 (9th Cir. 1985), holds to the contrary.

In *Merriweather*, federal agents performed a lawful protective sweep of a motel room incident to an arrest. During the sweep, an agent unlawfully searched the inside of a toilet tank and found money hidden there. *Id.* at 505. The police then obtained a search warrant for the motel room without relying on the discovery of the money, and officers who were unaware of the money executed the search warrant and found it. *Id*. We held that the money was admissible. In our opinion, we inaccurately characterized our decision as an application of the "inevitable discovery doctrine." *Id.* at 506. Our decision in *Merriweather* is, instead, properly characterized as an application of the independent source doctrine. Unlike the inevitable discovery doctrine, which asks whether evidence "*would have*" been discovered by lawful means rather than by means of the illegal search, *Nix v. Williams*, 467 U.S. 431, 447 (1984) (emphasis added), the independent source doctrine asks whether the evidence *actually* was "obtained independently from activities untainted by the initial illegality." *Murray v. United States*, 487 U.S. 533, 537 (1988).

The two doctrines are, of course, related. *See id.* at 539 ("The inevitable discovery doctrine, with its distinct requirements, is in reality an extrapolation from the independent source doctrine."). But the distinction between the two doctrines is important because they create different incentives. We do not apply the inevitable discovery doctrine to warrantless searches where probable cause existed and a warrant could therefore have been obtained because "[i]f evidence were admitted notwithstanding the officers' unexcused failure to obtain a warrant, simply because probable cause existed, then there would never be *any* reason for officers to seek a warrant." *Mejia*, 69 F.3d at 320. Thus, "to excuse the failure to obtain a warrant merely because the

officers had probable cause and could have inevitably obtained a warrant would completely obviate the warrant requirement of the fourth amendment." *United States v. Young*, 573 F.3d 711, 723 (9th Cir. 2009) (citation omitted). Put differently, allowing the government to claim admissibility under the inevitable discovery doctrine when officers have probable cause to obtain a warrant but fail to do so would encourage officers never to bother to obtain a warrant.

The independent source rule, by contrast, does not create this incentive. As the Supreme Court has explained, a rational officer who already has probable cause to obtain a search warrant will ordinarily not enter the premises without a warrant because "his action would add to the normal burden of convincing a magistrate that there is probable cause the much more onerous burden of convincing a trial court that no information gained from the illegal entry affected either the law enforcement officers' decision to seek a warrant or the magistrate's decision to grant it." *Murray*, 487 U.S. at 540.

The officers here knew they had probable cause to arrest Lundin. Deputy Aponte received corroborated information from two witnesses that hours earlier Lundin had committed numerous violent felonies. Aponte therefore requested Lundin's arrest under California Penal Code § 836. However, the officers who arrived at Lundin's home had no right, absent an arrest warrant, to arrest Lundin in his home, or, absent a search warrant, to search his home. *Payton*, 445 U.S. at 589–90. The officers nonetheless failed to obtain any warrant before coming onto Lundin's porch and knocking on his door with the intention of arresting him. Thus, the district court correctly held that the inevitable discovery exception to the exclusionary rule does not apply. Indeed, it

would have erred had it held to the contrary. *See Reilly*, 224 F.3d at 995 ("[T]he district court committed clear error in applying the inevitable discovery doctrine based on the agents' actual but unexercised opportunity to secure a search warrant.").

## Conclusion

For the foregoing reasons, we affirm the district court's grant of Lundin's motion to suppress the two handguns seized from Lundin's home on April 23. We remand for further proceedings.

**AFFIRMED.**