Filed 3/25/21  P. v. Barefield CA5

### NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>　　　Plaintiff and Respondent,<br><br>　　　　　v.<br><br>CHARLES BAREFIELD,<br><br>　　　Defendant and Appellant. | F078193<br><br>(Kern Super. Ct. No. BF168476A)<br><br><br>**OPINION** |

　　　APPEAL from a judgment of the Superior Court of Kern County.  Michael G. Bush and Judith K. Dulcich, Judges.*

　　　Michelle T. Livecchi-Raufi and Alexandr Satanovsky, under appointment by the Court of Appeal, for Defendant and Appellant.

　　　Xavier Becerra, Attorney General, Michael P. Farrell, Assistant Attorney General, Catherine Chatman and Nirav K. Desai, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

---

　　　* Judge Bush presided over the hearing on the motion to suppress; Judge Dulcich presided over the trial.

## INTRODUCTION

Appellant and defendant Charles Edwin Barefield raises one issue in this appeal, whether the trial court erred when it partially granted and partially denied his motion to suppress. Appellant sought suppression of three firearms which law enforcement had recovered from both inside and outside his residence. The lower court concluded that suppression was warranted for the firearm recovered from inside appellant's home, but not for the two recovered in his backyard.

We agree with appellant that he established a Fourth Amendment violation under the United States Constitution, and suppression was warranted for all of the firearms seized during the search. Accordingly, we reverse appellant's judgment and remand this matter for the trial court to vacate its prior ruling and grant the motion to suppress in its entirety.

## BACKGROUND

We summarize the procedural history and the facts from the suppression hearing.

### I. Appellant Files a Motion to Suppress in the Lower Court

Appellant filed a motion to suppress pursuant to Penal Code section 1538.5.[1] He contended that police officers had violated his constitutional rights when they searched his property without a warrant. During that search, officers had located two firearms in his backyard and a third firearm inside his residence. Appellant asked the trial court to suppress all items which the police had seized.

### II. The Facts from the Hearing for the Motion to Suppress

The trial court conducted an evidentiary hearing to resolve appellant's motion to suppress. We summarize the material testimony from that hearing.

In 2017, officers of the Bakersfield Police Department were searching for a suspect in an attempted murder case. That suspect, Carl Fite, had a warrant issued for his

---

[1] All future statutory references are to the Penal Code unless otherwise noted.

arrest, and the warrant authorized night service. Fite was a known gang member with the Eastside Crips. The officers had pictures of Fite, along with other identifying information and possible known addresses. The officers began searching for Fite at various residences, but they were unable to locate him.

In searching a police database, however, officers learned that, in 2014 (three years before these events), appellant and Fite had been together during a traffic stop. During that stop, both appellant and Fite had informed the officer that they were from "the east side," which the officer had believed was a reference to the Eastside Crips. Neither appellant nor Fite were arrested during the stop in 2014. No evidence had suggested that the two resided together.

Based on the traffic stop three years prior, the officers decided to visit appellant's residence in the hopes of locating Fite. At some point "a little bit after midnight" on May 25, 2017, a group of officers drove to appellant's home.[2] At that time, the officers did not have any information that suggested Fite resided at appellant's residence, and nothing indicated that Fite had been seen at that residence. Appellant was not a suspect in the incident that led to the arrest warrant issuing for Fite.[3]

Appellant's home was located within the traditional boundary of the Eastside Crips gang. His home sat on the corner of two residential streets in Bakersfield. When officers arrived, two vehicles were parked in a driveway outside appellant's house.

The officers created a perimeter around the property. Some officers set up on the northwest side, others on the east side, and others approached the front of the residence.

---

[2] The prosecutor represented to the trial court that the officers arrived at appellant's house at 12:34 a.m. The testimony during the suppression hearing was vague regarding the number of officers involved in this search. At *trial*, however, it was learned that 15 or 16 officers responded to appellant's address on the night in question. Appellant states that the "precise number" of officers involved in searching his property is not necessary to resolve this claim.

[3] Respondent concedes that the record does not reflect officers had information that Fite was at appellant's house.

One of the officers, Dean Barthelmes, took a position along the east fence line on a second driveway on appellant's property. He was at the southeast edge of the property. He stood outside a wooden fence that was dilapidated and about six feet high. There were some "large gaps" between the boards. As he approached that fence, he could see into appellant's backyard. Barthelmes is five feet 11 inches tall. Standing on his tiptoes, he could see over the wooden fence, and he could also see through gaps in the fence. He did not initially see anyone in appellant's backyard.

Another officer, Christian Hernandez, positioned himself at the northwest end of appellant's property near another six-foot high wooden fence. He stood on top of a brick or concrete property divider that was about three to four feet high. He looked over the wooden fence and he had a view of the side yard of appellant's house.

Appellant's backyard was partially illuminated from an interior light that emitted light at the back of the house. In addition, one exterior light was on that was affixed to an eave of the house. The exterior light emitted an "orange, yellowish glow" and was pointed "towards the driveway area almost back to where [Officer Barthelmes] was standing."

Officers knocked on appellant's front door. As those officers continued attempts to contact appellant at the front door, Officer Barthelmes saw a male (later identified as appellant) enter the backyard from the residence. Appellant walked toward the west fence line. Barthelmes had been standing at the east fence for a "couple of minutes" when he saw appellant. He did not see appellant's face, and he did not know whether he might be Fite or someone else.

When initially spotted, appellant was carrying a bag, and Barthelmes could not tell what was in the bag. Barthelmes said, "Stop, police." Appellant did not stop. Instead, he continued walking "a little bit quicker towards that west fence," and Barthelmes believed appellant "was going to flee over it." Barthelmes communicated over his radio that he had a "subject in the backyard going towards the west fence." As Barthelmes

4.

radioed this information, he heard Hernandez order appellant to stop. At that point, appellant turned around and walked back towards the residence.

While standing on the property divider, Officer Hernandez saw appellant "running" towards him while carrying a bag. Hernandez believed that appellant had seen him. Specifically, appellant took several steps down the narrow pathway along the side yard towards Hernandez, then turned and proceeded back and to the left, away from Hernandez. Hernandez identified himself "as Bakersfield Police Department" and yelled at appellant to stop. Appellant, however, did not stop.

Officer Barthelmes believed that appellant matched Fite's description.[4] Barthelmes tried to climb over the dilapidated fence, but it almost completely fell over. He and another officer kicked in some of the fence boards and they entered the backyard.

Officer Hernandez also thought appellant was Fite. Hernandez "hopped the fence," and he entered appellant's backyard and detained him. Appellant was face down on a patio with his hands fanned out to the side. After appellant was handcuffed, officers sat him up, looked at his face, and realized he was not Fite.

Within "[m]inutes" of handcuffing appellant, officers saw a bag "hanging off" the roof of the house above the area where appellant was being detained. Officer Hernandez (who "isn't that tall") got onto a patio chair and pulled the bag down. It was nylon and was similar to a bag for a camping chair. Upon holding the bag, each officer could immediately tell that it contained one or two firearms. They opened the bag and discovered two pistol-grip shotguns and shotgun ammunition. Officer Barthelmes testified that he opened the bag for "evidentiary purposes," because "[t]hey're weapons,

---

[4] Appellant is African-American. He was born in 1980; he is six feet, one inch tall; and he weighs around 170 pounds. Fite is also African-American. He was born in 1986; he is five feet eight inches tall and weighs around 135 pounds. Respondent notes that, although the officers were shown pictures of Fite, the record does not reflect that the officers had seen a photograph of appellant.

and they could be involved or could be material evidence related to the homicide and linked to Carl Fite."

After appellant had been detained and the firearms seized, officers performed a safety sweep inside the residence. They did not find anyone inside the house. However, they located one more rifle in plain view in the laundry room.

## III.    The Trial Court's Ruling

After hearing the testimony and arguments from counsel, the trial court took the matter under submission. It subsequently issued a written ruling. In its entirety, the ruling stated: "The motion to suppress is granted only as to any items seized inside the house. It is denied as to items located outside the house."[5]

## IV.    Appellant's Convictions and Sentence

After the trial court partially granted and partially denied appellant's motion to suppress, this matter proceeded to a jury trial.[6] Appellant was convicted of two counts of possession of a firearm by a felon (§ 29800, subd. (a)(1); counts 1 & 2); two counts of prohibited possession of a firearm (§ 29805; counts 3 & 4); and one count of possession of ammunition by a felon (§ 30305, subd. (a)(1); count 5). For counts 1, 2 and 5, appellant was sentenced to serve concurrent one-year terms in the custody of the Kern County Sheriff. Sentence on the remaining two convictions was stayed under section 654. Imposition of sentence was suspended, and appellant was placed on formal probation for three years.

Prior to sentencing, appellant had filed a motion, in part, to stay execution of judgment pending appeal. Appellant asserted that the trial court's ruling on the motion to

---

[5] During the hearing, the trial court verbally noted that appellant had been "clearly" and "certainly" fleeing out of the back of the residence when the officers were there. The court also remarked that "officers can go up to anybody's house and knock on the door. There's no illegalities about that. They can stand outside on a fence and look over."

[6] We omit the trial facts, which are irrelevant to the issue raised in this appeal.

suppress had been in error. The court agreed to postpone appellant's commitment date to serve his jail term so he would have time to file the present appeal.

## DISCUSSION

The Fourth Amendment of the United States Constitution protects individuals from "unreasonable searches" in their homes.[7] (U.S. Const., 4th Amend.) "The purpose of the Fourth Amendment is to prevent unreasonable governmental intrusions into the privacy of one's person, house, papers, or effects. The wrong condemned is the unjustified governmental invasion of these areas of an individual's life." (*United States v. Calandra* (1974) 414 U.S. 338, 354.)

A search under the Fourth Amendment occurs when the government (1) physically intrudes on constitutionally protected areas (*Florida v. Jardines* (2013) 569 U.S. 1, 5 (*Jardines*)) or (2) "when the government violates a subjective expectation of privacy that society recognizes as reasonable. [Citation.]" (*Kyllo v. United States* (2001) 533 U.S. 27, 33, citing *Katz* v. *United States* (1967) 389 U.S. 347, 361 (conc. opn. of Harlan, J. (*Katz*).) The United States Supreme Court has clarified that "[a] trespass on 'houses' or 'effects,' or a *Katz* invasion of privacy, is not alone a search unless it is done to obtain information; and the obtaining of information is not alone a search unless it is achieved by such a trespass or invasion of privacy." (*United States v. Jones* (2012) 565 U.S. 400, 408, fn. 5 (*Jones*).)

It is presumptively unreasonable for the government to conduct a search and seizure inside a home without a warrant. (*Payton v. New York* (1980) 445 U.S. 573, 586.) The curtilage – the area immediately surrounding and associated with the home – is part of the home for Fourth Amendment purposes. (*Jardines, supra,* 569 U.S. at pp. 6–7.) "When a law enforcement officer physically intrudes on the curtilage to gather evidence, a search within the meaning of the Fourth Amendment has occurred. [Citation.] Such

---

[7] This guarantee applies to the states through the Fourteenth Amendment of the federal Constitution. (*People v. Camacho* (2000) 23 Cal.4th 824, 829.)

7.

conduct thus is presumptively unreasonable absent a warrant." (*Collins v. Virginia* (2018) ___U.S.___ [138 S.Ct. 1663, 1670.)

A criminal defendant has the initial burden to produce evidence to show a prima facie case of an illegal search or seizure. The prosecution then bears the burden to establish by a preponderance of evidence the facts justifying a warrantless search. (*People v. Johnson* (2006) 38 Cal.4th 717, 728–729.) In reviewing the lower court's suppression ruling, we defer to the court's express and implied factual findings if supported by substantial evidence. However, we exercise our independent judgment in determining the legality of a search. (*People v. Lomax* (2010) 49 Cal.4th 530, 563.)

Appellant's leading argument is that the officers violated the "knock and talk" exception to the warrant requirement. He relies primarily on *Jardines, supra,* 569 U.S. 1 and *U.S. v. Lundin* (9th Cir. 2016) 817 F.3d 1151 (*Lundin*). He maintains that *Lundin*'s facts are "nearly identical to this case."

In contrast, respondent asserts that the officers did not violate the knock and talk doctrine. Respondent further contends that officers were lawfully positioned to see appellant's attempt to flee from his backyard. According to respondent, the officers did not conduct a search under the Fourth Amendment, and appellant did not enjoy a reasonable expectation of privacy under these circumstances.

To better understand the parties' positions, we first summarize the knock and talk exception to the warrant requirement. We then analyze *Jardines* and *Lundin* before turning to the respective arguments.

## I. The Knock and Talk Exception to the Warrant Requirement

A number of federal and state courts use the phrase "knock and talk" to describe law enforcement officers knocking on the door of a house, identifying themselves as officers, asking an occupant about a criminal matter, and even requesting permission to search the house. (*People v. Rivera* (2007) 41 Cal.4th 304, 310; *State v. Reinier* (Iowa 2001) 628 N.W.2d 460, 466; *U.S. v. Cormier* (9th Cir. 2000) 220 F.3d 1103, 1109;

*U.S. v. Jerez* (7th Cir. 1997) 108 F.3d 684, 691–692; *U.S. v. Kim* (3d Cir. 1994) 27 F.3d 947, 951.)  A knock and talk is recognized as an exception to the federal warrant requirement.  (*Lundin, supra,* 817 F.3d at p. 1158; *U.S. v. Perea-Rey* (9th Cir. 2012) 680 F.3d 1179, 1187; *Estate of Smith v. Marasco* (3d Cir. 2003) 318 F.3d 497, 519.)

The United States Supreme Court holds "it is not a Fourth Amendment search to approach the home in order to speak with the occupant, *because all are invited to do that.* The mere 'purpose of discovering information,' [citation], in the course of engaging in that permitted conduct does not cause it to violate the Fourth Amendment.  But no one is impliedly invited to enter the protected premises of the home in order to do nothing but conduct a search." (*Jardines, supra,* 569 U.S. at p. 9, fn. 4.)  As such, a Fourth Amendment search generally does not occur when a government officer approaches a home to speak with an occupant.  This is because an implied license exists for visitors to approach a residence "by the front path, knock promptly, wait briefly to be received, and then (absent invitation to linger longer) leave." (*Id.* at p. 8.)  Thus, an officer without a warrant may approach a home and knock because "that is 'no more than any private citizen might do.' [Citation.]" (*Ibid.*)

"The scope of the knock and talk exception is limited in two respects.  First, it ceases where an officer's behavior 'objectively reveals a purpose to conduct a search.' [Citation.]  Second, the exception is geographically limited to the front door or a 'minor departure' from it.  [Citation.]" (*United States v. Walker* (11th Cir. 2015) 799 F.3d 1361, 1363 (per curiam) (*Walker*).)

## II.     Jardines

In *Jardines*, law enforcement personnel without a warrant brought a drug-sniffing dog onto the porch of a homeowner to investigate whether the dog could detect any odor of narcotics within the residence.  (*Jardines, supra,* 569 U.S. at pp. 3–4.)  The issue before the United States Supreme Court was whether the use of the dog constituted a "search" within the meaning of the Fourth Amendment.  (*Id.* at p. 3.)  Justice Scalia, who

9.

wrote the majority opinion, concluded that the officer had physically intruded upon the curtilage of the home. As such, a Fourth Amendment search had occurred. (*Id.* at pp. 11–12.) Because a physical intrusion had occurred, Justice Scalia determined it was unnecessary to decide whether the officers' investigation of the home violated a reasonable expectation of privacy under *Katz, supra,* 389 U.S. 347. (*Jardines, supra,* 569 U.S. at p. 11.)

In dissent, Justice Alito spoke for the remaining four justices. He concluded the officers were no different than other members of the public who have a license to approach the front door of a house and to remain there for a brief time.[8] (*Jardines, supra,* 569 U.S. at p. 16 (dis. opn. of Alito, J.).)

In finding that a search had occurred under the Fourth Amendment, the *Jardines* majority noted that the officers had gathered information in the curtilage of the house by physically entering and occupying the area to engage in conduct not explicitly or implicitly permitted by the homeowner. (*Jardines, supra,* 569 U.S. at pp. 5–6.) The Fourth Amendment's protection against unreasonable governmental intrusion in the home "would be of little practical value" if agents "could stand in a home's porch or side garden and trawl for evidence with impunity; the right to retreat would be significantly diminished if the police could enter a man's property to observe his repose from just outside the front window." (*Id.* at p. 6.)

After determining the officers' investigation took place in a constitutionally protected area, the *Jardines* majority examined whether it was accomplished through an unlicensed physical intrusion. The majority noted that, although law enforcement

---

[8] Justice Alito also concluded in his dissent that the majority's opinion was inconsistent with the test under *Katz, supra,* 389 U.S. 347, regarding a reasonable expectation of privacy. According to Justice Alito, "[a] reasonable person understands that odors emanating from a house may be detected from locations that are open to the public, and a reasonable person will not count on the strength of those odors remaining within the range that, while detectible by a dog, cannot be smelled by a human." (*Jardines, supra,* 569 U.S. at p. 17 (dis. opn. of Alito, J.).)

officers did not need to " 'shield their eyes' " when passing a home on a public thoroughfare, an officer's leave to gather information "is sharply circumscribed" when he or she enters an area protected by the Fourth Amendment.[9] (*Jardines, supra,* 569 U.S. at p. 7.) The majority concluded that the officers had entered the constitutionally protected extension of the home in question, and no implied permission had existed for them to do so. (*Jardines, supra,* at p. 8.)

Jardines confirmed that, based on the "implied" habits of the country, a license exists for all persons, including law enforcement agents lacking a warrant, to knock on a resident's front door, wait briefly, and then leave unless invited to stay longer. (*Jardines, supra,* 569 U.S. at p. 8.) However, introducing a trained police dog to explore the curtilage exceeded that implied license. (*Id.* at p. 9.) "The scope of a license – express or implied – is limited not only to a particular area but also to a specific purpose." (*Ibid.*) "[T]he background social norms that invite a visitor to the front door do not invite him there to conduct a search." (*Ibid.*, fn. omitted.)

The *Jardines* court confirmed that the subjective intent of an officer is irrelevant when a search is objectively reasonable. (*Jardines, supra,* 569 U.S. at p. 10.) However, whether an officer's conduct was objectively reasonable depends on whether officers had an implied license to enter the curtilage, which turns on the purpose for which they entered. If the behavior objectively reveals a purpose to conduct a search, then the scope of the implied license is exceeded. (*Ibid.*) The majority in *Jardines* concluded that the government's use of a trained police dog to investigate the home and its curtilage constituted a search within the meaning of the Fourth Amendment. (*Id.* at pp. 11–12.)

---

[9] The majority in *Jardines* noted that when visual observation of a home is conducted from public navigable airspace, it must be done " 'in a physically nonintrusive manner.' [Citation.]" (*Jardines, supra,* 569 U.S. at p. 7, quoting *California v. Ciraolo* (1986) 476 U.S. 207, 213.)

11.

### III. Lundin

In *Lundin, supra,* 817 F.3d 1151, law enforcement agents went to the defendant's home at 4:00 a.m. in response to a police request to find and arrest him. The agents had neither an arrest nor a search warrant. After knocking on the defendant's front door, agents heard crashing noises coming from the back of the house. The agents ran to the back, and ordered the defendant to come out of the fenced-in backyard. The defendant was arrested. After the defendant was placed in a patrol car, agents searched the home, including the back patio. Two handguns were recovered in open view in the back patio. The district court suppressed the handguns as the result of an illegal search. The government appealed, and the Ninth Circuit Court of Appeals affirmed. (*Lundin, supra,* 817 F.3d at pp. 1154–1157.)

According to the Ninth Circuit in *Lundin*, it was undisputed that the government had seized the two handguns during a warrantless search of the defendant's home. As such, the handguns were "the product of a presumptively unreasonable search." (*Lundin, supra,* 817 F.3d at p. 1157.) Consequently, to avoid suppression of the handguns, the government bore the burden to demonstrate that either an exception to the warrant requirement or an exception to the exclusionary rule applied. (*Ibid.*)

The Ninth Circuit confirmed that law enforcement officers may conduct a warrantless search of a home when exigent circumstances exist which are so compelling that a warrantless search is objectively reasonable under the Fourth Amendment. (*Lundin, supra,* 817 F.3d at p. 1158.) "However, exigent circumstances cannot justify a warrantless search when the police 'create the exigency by engaging … in conduct that violates the Fourth Amendment.' [Citation.]" (*Ibid.*)

The *Lundin* court analyzed, and rejected, the government's argument that the agents had been permitted to knock on the defendant's door under the knock and talk exception to the warrant requirement. (*Lundin, supra,* 817 F.3d at p. 1158.) This argument failed for two reasons: First, unexpected visitors are customarily expected to

12.

knock on a front door of a home "only during normal waking hours." (*Id.* at p. 1159.) The Ninth Circuit determined that the officers knocked on the defendant's door around 4:00 a.m. without evidence that he "generally accepted visitors at that hour, and without a reason for knocking that a resident would ordinarily accept as sufficiently weighty to justify the disturbance. Indeed, the officers here acted for a purpose that virtually no resident would willingly accept." (*Ibid.*)

Second, the *Lundin* court noted that "the scope of a license is often limited to a specific purpose, [citation], and the customary license to approach a home and knock is generally limited to the 'purpose of asking questions of the occupants,' [citation]. Officers who knock on the door of a home for other purposes generally exceed the scope of the customary license and therefore do not qualify for the 'knock and talk' exception." (*Lundin, supra,* 817 F.3d at p. 1159.) *Lundin* held that "[t]he 'knock and talk' exception to the warrant requirement does not apply when officers encroach upon the curtilage of a home with the intent to arrest the occupant. Just as 'the background social norms that invite a visitor to the front door do not invite him there to conduct a search,' [citation], those norms also do not invite a visitor there to arrest the occupant. We do not hold that an officer may never conduct a 'knock and talk' when he or she has probable cause to arrest a resident but does not have an arrest warrant. An officer does not violate the Fourth Amendment by approaching a home at a reasonable hour and knocking on the front door with the intent merely to ask the resident questions, even if the officer has probable cause to arrest the resident." (*Id.* at p. 1160.)

*Lundin* held that a Fourth Amendment violation had occurred when the agents knocked on the defendant's front door with the intent to arrest him. Because that unconstitutional conduct caused the allegedly exigent circumstance – the crashing noises in the backyard – the government could not justify the search that resulted in the seizure

13.

of the two handguns.[10] (*Lundin, supra,* 817 F.3d at p. 1160.) The Ninth Circuit affirmed the lower court's order granting the defendant's motion to suppress. (*Id.* at p. 1162.)

## IV. Jardines And Lundin Establish a Fourth Amendment Violation in this Matter

The parties dispute whether the police violated the knock and talk doctrine. According to appellant, the officers exceeded their implied license to approach his house. He asserts we should apply *Jardines* and *Lundin.* In contrast, respondent claims that *Jardines* and *Lundin* are factually distinguishable, and respondent notes that *Lundin* is not binding on this court.

The parties also disagree whether a constitutional violation occurred because this police encounter happened after midnight. Appellant asserts that this alone establishes a violation of the Fourth Amendment because a reasonable homeowner does not grant an implied license for people to approach his door at such a late hour. On the other hand, respondent claims it was reasonable for the officers to conduct the knock and talk after midnight. Respondent notes that, when the officers approached appellant's residence, two vehicles were parked in his driveway, and an interior light was on at the back of the house.

Although the facts from this matter are distinguishable from the unique circumstances in *Jardines*, we agree with appellant that the legal principles articulated in *Jardines* control here. In *Jardines*, the majority and dissenting opinions discussed in dicta when a knock and talk may occur. In his dissent, Justice Alito noted that, "as a general matter, … a visitor [may not] come to the front door in the middle of the night without an express invitation. [Citation.]" (*Jardines, supra,* 569 U.S. at p. 20 (dis. opn. of Alito, J.). In response, the majority reasoned that the dissent "quite rightly" relied on the fact that a nighttime knock would be alarming in concluding that nighttime visits

---

**10** The *Lundin* court also analyzed and rejected the government's arguments that both a "protective sweep" and "inevitable discovery" justified the warrantless search. (*Lundin, supra,* 817 F.3d at pp. 1161–1162.)

would be outside the scope of an implied license. (*Id.* at p. 9, fn. 3 ["We think a typical person would find it ' "a cause for great alarm" ' (the kind of reaction the dissent quite rightly relies upon to justify its no-night-visits rule, [citation]) to find a stranger snooping about his front porch *with or without* a dog."].)

Based on these various comments appearing in *Jardines*, it is apparent that the United States Supreme Court agrees a nighttime visit would typically be outside the scope of any implied license for any citizen, including police officers, to approach the front door of a residence. Moreover, the Ninth Circuit in *Lundin* held that a knock and talk should usually occur "only during normal waking hours." (*Lundin, supra,* 817 F.3d at p. 1159.) Although *Lundin* is not binding on this court, it is instructive regarding the knock and talk doctrine under federal law. (See *People v. Brooks* (2017) 3 Cal.5th 1, 90 ["We are not bound by the decisions of the federal appellate courts, although they may be considered for their persuasive weight"].)

We reject respondent's assertion that it was reasonable for the officers to conduct this knock and talk after midnight. The officers did not have a warrant to either arrest appellant or search his residence. Appellant was not a suspect in the criminal matter that led to an arrest warrant issuing for Fite. The officers had no information that Fite was at appellant's residence. Appellant's last known contact with Fite occurred three years prior. During the suppression hearing, Officer Barthelmes confirmed that he did not know if appellant regularly accepted visitors at his house at midnight.

Nothing from this record reasonably demonstrates that appellant was accepting visitors at such a late hour when the officers initiated this knock and talk. Although two vehicles were parked in appellant's driveway and his backyard was partially illuminated from an interior light that emitted light at the back of the house, there was no evidence that officers saw anyone moving inside or outside the residence. The evidence did not reasonably suggest someone was awake. Under these circumstances, we agree with

15.

appellant that the officers deviated from the implied license acceptable for any citizen to invade appellant's curtilage at that time of night.

A Fourth Amendment search, however, requires more than a mere trespass on a constitutionally protected area (or a *Katz* invasion of privacy). Instead, such an invasion must be coupled with an intent to obtain information. (*Jones, supra,* 565 U.S. at p. 408, fn. 5.) Respondent contends that nothing reflects an intent by the officers to conduct a search or gather evidence at appellant's front door. According to respondent, *Jardines* is distinguishable for that reason. Respondent also claims that the officers "did no more than what an ordinary visitor would do." We reject these assertions.

This record establishes that the officers held an intent to gather information or discover evidence when this knock and talk occurred. Officers Hernandez and Barthelmes made it clear that the officers went to appellant's home because they had an arrest warrant for Fite, and they were actively looking for him. They had been looking for Fite for about seven hours that night, and they had already visited several other locations, including residences. According to Barthelmes, the "whole purpose" of going to appellant's residence "was to try and find" [Fite]." Before officers knocked on appellant's front door, other officers surrounded his property and began visually inspecting his backyard. Under these circumstances, a search within the meaning of the Fourth Amendment occurred because the government invaded appellant's curtilage while attempting to obtain information or evidence. (See *Jardines, supra,* 569 U.S. at p. 5 [a Fourth Amendment search occurs when the government physically intrudes on constitutionally protected areas]; *Jones, supra,* 565 U.S. at p. 408, fn. 5 [a trespass on a protected area is not a search unless it is done to obtain information].) The officers did far more than what an ordinary visitor would do, especially in the middle of the night.

We agree with appellant that the facts from this matter are very similar to *Lundin*. The officers knocked on appellant's door after midnight without evidence that he "generally accepted visitors at that hour, and without a reason for knocking that a resident

16.

would ordinarily accept as sufficiently weighty to justify the disturbance. Indeed, the officers here acted for a purpose that virtually no resident would willingly accept." (*Lundin, supra,* 817 F.3d at p. 1159.) The background social norms that invite a visitor to the front door do not invite him there to conduct a search. (*Id.* at p. 1160.)

According to respondent, however, the attempted knock and talk should be viewed separately from the officers who looked over and through appellant's fence and into his backyard. Respondent asserts that appellant did not enjoy a reasonable expectation of privacy in his backyard. Respondent also contends that the officers positioned along the backyard were merely "lookouts" who secured the area during the attempted contact at the front door. Respondent notes that a constitutional violation does not occur when an officer observes something with the naked eye from a vantage point open to the public. Respondent emphasizes that a Fourth Amendment violation does not occur when a person "knowingly exposes" something to the public, even in his own home.[11]

We disagree with respondent that our analysis should separate the conduct of the officers who positioned themselves along appellant's fence from the overall knock and talk that occurred. The officers acted as a unit. Some officers went to appellant's front door while other officers surrounded his property and began to search his backyard over and through his fences. Collectively, the officers did more than merely approach appellant's residence "by the front path, knock promptly, wait briefly to be received, and then (absent invitation to linger longer) leave." (*Jardines, supra,* 569 U.S. at p. 8.) The officers' behavior objectively demonstrated an intent to conduct a search and the officers

---

[11] We agree with respondent that "[a]n officer's observation with the naked eye from a vantage point open to the public is ordinarily not regarded as a search within the meaning of the constitutional proscription against warrantless searches. [Citations.]" (*People v. Edelbacher* (1989) 47 Cal.3d 983, 1015.) Moreover, " '[w]hat a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection.' [Citation.]" (*Ibid.*, quoting *Katz, supra,* 389 U.S. at p. 351.)

17.

did not limit themselves to approaching appellant's front door. The scope of a permissible knock and talk was exceeded. (See *Walker, supra,* 799 F.3d at p. 1363.)

Justice Scalia instructed that we do not reach the issue of reasonable expectation of privacy under *Katz* if a physical intrusion, coupled with an intent to gather information, has occurred involving a constitutionally protected area. (*Jardines, supra,* 569 U.S. at pp. 5, 11.) "The *Katz* reasonable-expectations test 'has been *added to*, not *substituted for*,' the traditional property-based understanding of the Fourth Amendment, and so is unnecessary to consider when the government gains evidence by physically intruding on constitutionally protected areas. [Citation.]" (*Jardines, supra,* 569 U.S. at p. 11.) The *Jardines* majority stated that "[o]ne virtue of the Fourth Amendments property-rights baseline is that it keeps easy cases easy. That the officers learned what they learned only by physically intruding on Jardines' property to gather evidence is enough to establish that a search occurred." (*Ibid.*)

Here, officers spotted appellant in his own backyard only because they conducted a knock and talk after midnight with the intent to find Fite. The officers did not attempt to contact appellant during normal waking hours. The officers did not limit their movements to an area near and around appellant's front door. This intrusion at an unreasonable hour of the night was neither expressly nor impliedly permitted. Based on *Jardines* and *Lundin*, we agree with appellant that a Fourth Amendment violation occurred under these circumstances.[12]

Respondent emphasizes that the officers held a mistaken but honest belief they were pursuing Fite. Respondent contends the officers "reasonably suspected criminal activity" once appellant refused their commands to stop. Respondent alternatively claims

---

[12] In his motion to suppress before the trial court, appellant cited *Jardines* and *Lundin*. During oral arguments at the hearing regarding appellant's motion to suppress, defense counsel argued, in part, that a federal constitutional violation had occurred because the officers violated the knock and talk exception to the warrant requirement. Defense counsel specifically directed the trial court's attention to *Lundin*.

that appellant's flight in his backyard represented an exigent circumstance which justified his seizure.

We reject these arguments. The subjective intent of an officer is irrelevant when a search is objectively reasonable. (*Jardines, supra,* 569 U.S. at p. 10.) However, the objective reasonableness of an officer's conduct depends on whether the officer held an implied license to enter the curtilage, which turns on the purpose for which he or she entered. If the behavior objectively reveals a purpose to conduct a search, then the scope of the implied license is exceeded. (*Ibid.*)

In this matter, officers entered appellant's property after midnight with the intent to find Fite. Some of the officers approached appellant's curtilage at his front door while other officers spread out around his property and began looking into his backyard. Whether or not the officers made a reasonable mistake in believing appellant was Fite, the Fourth Amendment violation in this matter occurred even before the officers spotted appellant. The officers did not have an implied license under these circumstances to disturb appellant inside his residence at that hour. (See *Jardines, supra,* 569 U.S. at p. 5.)

Similar to *Lundin*, the improper knock and talk was the very reason why appellant went into his backyard only to be spotted by officers who had positioned themselves around the perimeter of his property. The government cannot justify a Fourth Amendment search and seizure in this situation because it created the alleged exigent circumstance. (See *Kentucky v. King* (2011) 563 U.S. 452, 462 [if police do not create an exigency then warrantless entry to prevent the destruction of evidence is reasonable and allowed]; *Lundin, supra,* 817 F.3d at p. 1160 [officers' unconstitutional conduct caused alleged exigent circumstance so search resulting in seizure of handguns was improper].) We decline respondent's invitation to find *Lundin* distinguishable.

To overcome the holding in *Lundin*, respondent offers a competing federal appellate case. In *Walker, supra,* 799 F.3d 1361, the Eleventh Circuit Court of Appeals held that officers did not violate *Jardines* when they conducted a series of knock and

19.

talks. The officers were searching for a suspect who had an outstanding warrant. The officers believed the suspect could be found at another person's residence. At about 9:00 p.m., the officers knocked at that residence, but no one answered. They left and returned at 11:00 p.m., and again no one answered their knocks. A Honda Civic was parked in an open-sided carport, and the vehicle had not been there earlier. The following morning, at about 5:00 a.m., the officers drove past the residence and they spotted some house lights on. In addition, an interior light was on inside the Honda Civic, and a person was seen "with his head resting on the steering wheel." (*Walker, supra,* 799 F.3d at p. 1362.) The officers contacted the person in the vehicle, who was the homeowner. The officers told him that they were looking for the suspect. The owner said the suspect was not at the house and the officers were invited to search the residence. Upon entering, the officers did not find the suspect, but they discovered counterfeit currency. The homeowner was arrested. (*Id.* at pp. 1362–1363.)

The *Walker* court held that the officers did not exceed the scope of the knock and talk exception to the warrant requirement. First, their behavior did not objectively reveal a purpose to search. Instead, the officers were merely trying to talk to someone to discuss the whereabouts of the suspect. (*Walker, supra,* 799 F.3d at p. 1363.) Second, approaching the parked Honda Civic inside the open-sided carport did not exceed the geographic limit of a knock and talk exception. (*Id.* at p. 1364.) Finally, the Eleventh Circuit determined that the encounter before sunrise did not exceed the implied invitation that underlies a knock and talk. Instead, it was "not unreasonable" to believe someone was inside the parked Honda Civic because its interior light was on. In addition, lights were on inside the house. As such, it was reasonable that the officers approached the vehicle, tapped on a window, and spoke with the homeowner. *Walker* found no Fourth Amendment violation. (*Ibid.*)

We decline to follow *Walker*, which is distinguishable. The officers in *Walker* demonstrated an intent not to search the property but to contact the homeowner in order

20.

to discuss a suspect's whereabouts. Although the contact did not occur during normal waking hours, the homeowner had been spotted outside in a parked vehicle. The officers only had a minor deviation from the homeowner's front porch. In contrast to *Walker*, the officers in this matter initiated a knock and talk after midnight without any reasonable evidence that appellant was awake and/or accepting visitors at that hour. While officers went to appellant's front door, other officers surrounded his property and began peering through and over his fence into his backyard. The officers never obtained appellant's permission to search the premises. It was the improper knock and talk that caused appellant to enter his backyard, which led to his arrest. *Walker* is inapposite.

The totality of the circumstances establishes an unreasonable governmental intrusion. The officers entered appellant's curtilage with the intent to gather information. This intrusion was neither explicitly not implicitly permitted. (See *Jardines, supra,* 569 U.S. at pp. 5–6.) Accordingly, a Fourth Amendment violation occurred, and we turn to the remedy.

## V.     The Exclusionary Rule is Appropriate in this Situation

Appellant argues that the improper police conduct led directly to the seizure of his firearms. He contends that all of his firearms should have been suppressed under the exclusionary rule. In contrast, respondent asserts that, if the officers violated the Fourth Amendment, their conduct does not warrant suppressing the two firearms recovered in the bag outside. According to respondent, this record does not suggest "systemic negligence." Respondent emphasizes that the officers acted in good faith, and they had reason to believe it was necessary to enter appellant's backyard to detain "a potentially dangerous suspect who was trying to escape into the night." Respondent maintains that the officers did not act with "a deliberate, reckless, or grossly negligent disregard for the Fourth Amendment." However, respondent concedes that, if the trial court erred by not suppressing the seized evidence and if the exclusionary rule applies, then the government

21.

cannot show that the error was harmless beyond a reasonable doubt under *Chapman v. California* (1967) 386 U.S. 18, 24.

We agree with appellant that the exclusionary rule is appropriate in this situation. This rule is "a judicially created means of deterring illegal searches and seizures. [Citation.]" (*Pennsylvania Bd. of Probation and Parole v. Scott* (1998) 524 U.S. 357, 363.) The United States Supreme Court recognizes certain exceptions to the exclusionary rule. Those include (1) the independent source doctrine; (2) the inevitable discovery doctrine; and (3) the attenuation doctrine. (*Utah v. Strieff* (2016) ___U.S.___ [136 S.Ct. 2056, 2061].) Under the attenuation doctrine, evidence is admissible when the connection between unconstitutional police conduct and the evidence is remote or has been interrupted by some intervening circumstance. (*Ibid.*) Under those circumstances, the interests protected by the Fourth Amendment would not be served by suppression of the evidence. (*Ibid.*)

In this matter, the connection between the unconstitutional police conduct and the seizure of appellant's firearms was neither remote nor interrupted by intervening circumstances. Instead, police seized appellant and his firearms only because they conducted a knock and talk in excess of the limitations set forth by the United States Supreme Court. It was the improper police conduct which caused appellant to leave his residence and enter his backyard. As such, all of the firearms seized during this incident should have been suppressed. Accordingly, the trial court erred in failing to grant appellant's motion to suppress in its entirety. We will reverse his judgment and direct the court to grant the motion in its entirety.[13]

## DISPOSITION

The judgment is reversed and the convictions are vacated. This matter is remanded with directions for the trial court to vacate its prior ruling and grant appellant's

---

[13] In light of our holding, we need not reach appellant's remaining claims.

motion to suppress in its entirety.  The court shall conduct further proceedings as necessary.

POOCHIGIAN, Acting P.J.

WE CONCUR:


DETJEN, J.


PEÑA, J.

23.