*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

BRADLEY NOLAN CLARK,

        Defendant-Appellant.

UNPUBLISHED
July 21, 2022

No. 352874
Wayne Circuit Court
LC No. 18-008627-02-FH

Before: BOONSTRA, P.J., and GLEICHER and LETICA, JJ.

LETICA, J. (*concurring in part, dissenting in part*).

I would affirm defendant's convictions. Reversal is not required when the evidence was sufficient to support the jury's finding that defendant acted with corrupt intent and the trial court's inquiry did not prejudice defendant.[1]

## I. MISCONDUCT IN OFFICE

To determine whether the evidence presented was sufficient to sustain a conviction, this Court views "the evidence in the light most favorable to the prosecution, and considers whether there was sufficient evidence to justify a rational trier of fact in finding guilt beyond a reasonable doubt." *People v Oros*, 502 Mich 229, 240; 917 NW2d 559 (2018) (quotation marks and citation omitted). "[T]he standard of review is deferential: a reviewing court is *required* to draw all reasonable inferences and make credibility choices in support of the jury verdict." *Id.* (quotation marks and citation omitted; emphasis added). "It is for the trier of fact, *not the appellate court*, to determine what inference may be fairly drawn from the evidence and to determine the weight to be accorded those inferences." *Id.* (quotation marks and citation omitted; emphasis added).

"At common law, misconduct in office was defined as 'corrupt behavior by an officer in the exercise of the duties of his office or while acting under color of his office.' " *People v Perkins*,

---

[1] I otherwise agree with the majority's resolution of the issues addressing defendant's challenges to the prosecutor's charging decision and the vagueness claim.

468 Mich 448, 456; 662 NW2d 727 (2003), quoting *People v Coutu*, 459 Mich 348, 354; 589 NW2d 458 (1999), quoting Perkins & Boyce, Criminal Law (3d ed), p 543. Our Supreme Court has recognized that a police officer commits misconduct in office when he makes a false statement in a police report to support an arrest warrant. *Coutu*, 459 Mich at 354 n 3; *People v Thomas*, 438 Mich 448, 451, 458 n 8; 475 NW2d 288 (1991). See also *Thomas*, 438 Mich at 460-462 (BOYLE, J., concurring). "An officer [may] be convicted of misconduct in office . . . for committing any act which is itself wrongful, malfeasance [or] . . . for committing a lawful act in a wrongful manner, misfeasance . . . ." *Perkins*, 468 Mich at 456. But simply committing the act is not enough as "the offender must also act with a corrupt intent, i.e., with a 'sense of depravity, perversion or taint.' " *Id*., quoting Perkins, p 542.

> "Depravity" is defined as "the state of being depraved" and "depraved" is defined as "morally corrupt or perverted." *Random House Webster's College Dictionary* (1997). "Perversion" is "the act of perverting," and the term "perverted" includes in its definition "misguided; distorted; misinterpreted" and "turned from what is considered right or true." *Id.* The definition of "taint" includes "a trace of something bad or offensive." *Id*. Pursuant to the definitions, a corrupt intent can be shown where there is intentional or purposeful misbehavior or wrongful conduct pertaining to the requirements and duties of office by an officer. See also Perkins & Boyce, *supra* at 542 ("It is *corrupt* for an officer purposely to violate the duties of his office."). The corrupt intent needed to prove misconduct of office does not necessarily require an intent for one to profit for oneself. [*Thomas*, 438 Mich at 461 n 6.]
>
>> Official misconduct does not necessarily involve money as do the crimes of bribery and extortion, but as a common-law offense is much more inclusive, misconduct in office is not limited to obtaining property from another, but is supported if there is an injury to the public or an individual. [67 CJS, Officers, § 256, p 790.] [*People v Coutu (On Remand)*, 235 Mich App 695, 706-707; 599 NW2d 556 (1999).]

On the other hand, misconduct in office "does not encompass erroneous acts done by officers in good faith or honest mistakes committed by an officer in the discharge of his duties." *Id*. at 706, citing Perkins & Boyce, Criminal Law, p 541.

"[M]inimal circumstantial evidence and reasonable inferences can sufficiently prove the defendant's state of mind, knowledge, or intent." *People v Miller*, 326 Mich App 719, 735; 929 NW2d 821 (2019). A defendant's "[i]ntent is a mental attitude made known by [his] acts." *People v Strong*, 143 Mich App 442, 452; 372 NW2d 335 (1985). Stated otherwise, "[i]ntent is a secret of the defendant's mind, which he can disclose by his declarations or by his actions[,] and his actions sometimes speak louder than words." *Id*. (quotation marks and citations omitted).

Viewing the evidence presented during defendant's trial in the light most favorable to the prosecution, a reasonable juror could conclude that defendant acted with the requisite corrupt intent when he violated the Fourth Amendment and made false statements in the police report he

-2-

prepared regarding the police entry in order to request criminal charges against homeowner Tashar Cornelius.

## A. THE CONSTITUTIONAL VIOLATION

On Monday, December 4, 2017, PC reported to Eighth Precinct personnel that Michael Hopkins, the father of her children, committed a felony home invasion. Defendant, who was one of five officers in the Detroit Police Department's Home Invasion Task Force, was assigned PC's matter. He followed up by calling PC and going to her home. PC told defendant that Hopkins lived at 22554 Pembroke; however, she also reported that he "sometimes" stayed at a friend's home on Glastonbury Avenue.[2]

At trial, defendant testified that he returned to the police precinct, retrieved a photograph, and returned to PC's house, where she identified the photograph as being one of Hopkins. According to defendant, the Pembroke address was on Hopkins's driver's license and Hopkins was the sole person the Secretary of State had registered to that address.[3]

After PC's initial report, she contacted defendant five times. Seven weeks later, on January 22, 2018, PC returned to the precinct to report Hopkins's escalating behaviors, including at least one incident that occurred in another jurisdiction. Defendant testified that he told PC "we've been by the house and I'm not seeing anything." Defendant further testified that he at least wanted to see a car in the driveway to indicate that someone was inside the Pembroke home and that "a lot of times" the police would not stop at a home and knock on the door because doing so

---

[2] Unbeknownst to the jury, the trial court earlier denied defendant's motion to quash, rejecting his contention that the warrantless entry and search were reasonable due to exigent circumstances. Based on the information provided to the court, there were three potential addresses for Hopkins— Pembroke, Glastonbury, and Minock. In rendering its decision, the trial court noted that (1) after arriving at the Pembroke home, the police never ran a Law Enforcement Information Network query on the vehicle parked in Cornelius's driveway to determine who owned it, (2) Cornelius never consented to the police entry, and (3) contrary to the contention that Cornelius engaged in "furtive gesture[s]" while in his home's doorway, the bodycam video showed that Cornelius was moving to close the door after telling the police that they could not enter without a warrant.

[3] Cornelius testified that he was "positive" that his driver's license, which he showed defendant, listed the Pembroke address. Defendant, however, testified it contained a different address, possibly one on Hickory Street. Cornelius's driver's license was not produced at trial.

Cornelius further testified that he had lived in the Pembroke home since June 2015 (over 2½ years before the police arrived). And on the bodycam video defendant told Cornelius, "Michael's mother lives here," not that then 41-year-old Michael Hopkins did. Indeed, at the 2019 trial, the parties stipulated that Cornelius's mother would testify that Hopkins's mother had not lived at the Pembroke address for five years. Cornelius himself recalled receiving mail addressed to "a Hopkins" at the Pembroke address in 2015, which he discarded. The bodycam video depicted defendant subsequently retrieving a water-shutoff notice in the wall-mounted mailbox located next to Cornelius's door and informing Cornelius of it.

would alert the suspect that law enforcement was looking for him. Yet, defendant only directly testified that he had driven by the Pembroke address once—on his way back to the station after speaking with PC on December 4, 2017. On that occasion, defendant simply drove by because he saw no vehicle in the driveway.

On January 22, PC insisted that Hopkins lived at 22554 Pembroke. PC reported Hopkins was driving a white SUV, which she was "pretty sure" was a rental because it had out-of-state license plates. PC provided no information about the make, model, or year of Hopkins's vehicle. PC, who had a concealed weapon license, further reported Hopkins suggested he was armed and he threatened to kill her.

Defendant updated Sergeant Paul Glaza[4] regarding PC's situation and Sergeant Glaza directed defendant to grab Officer Justin Lyons[5] to go to the Pembroke address. According to Officer Lyons, the police planned a knock-and-talk at Hopkins's "known address" to attempt to speak with Hopkins and arrest him. According to defendant, a knock-and-talk involved knocking on the door, talking to whomever was inside, and seeing if the suspect came to the door. In defendant's experience, someone else typically came to the door and tried to get the police to leave; however, if the suspect came to the door, the police would arrest him.

When the officers, who were in plain clothes, arrived at the Pembroke address in an unmarked car, they were wearing bodycams. Defendant initially forgot to activate his bodycam because it was a new piece of equipment, but did so after his interaction with Cornelius began.

## 1. KNOCK AND TALK

"A 'knock and talk,' when performed within its proper scope, is not a search at all." *People v Frederick*, 500 Mich 228, 235; 895 NW2d 541 (2017). "The proper scope of a knock and talk is determined by the 'implied license' that is granted to 'solicitors, hawkers, and peddlers of all kinds.' " *Id.*, quoting *Florida v Jardines*, 569 US 1, 8; 133 S Ct 1409; 185 L Ed 2d 495 (2013) (quotation marks and citation omitted). "This implicit license typically permits the visitor to approach the home by the front path, knock promptly, wait briefly to be received, and then (absent invitation to linger longer) leave." *Jardines*, 569 US at 8. "Thus, a police officer not armed with a warrant may approach a home and knock, precisely because that is 'no more than any private citizen might do.' " *Id.*, quoting *Kentucky v King*, 563 US 452, 469; 131 S Ct 1849; 179 L Ed 2d 865 (2011) (quotation marks and citations omitted). The Supreme Court explained:

> [W]hether the person who knocks on the door and requests the opportunity to speak is a police officer or a private citizen, the occupant has no obligation to open the door or to speak. Cf. *Florida v Royer*, 460 US 491, 497-498; 103 S Ct 1319; 75 L Ed 2d 229 (1983) ("[H]e may decline to listen to the questions at all and may go on his way"). When the police knock on a door but the occupants choose not to respond or to speak, "the investigation will have reached a conspicuously low

---

[4] Sergeant Glaza did not testify at trial.

[5] Officer Lyons later received immunity from prosecution.

point," and the occupants "will have the kind of warning that even the most elaborate security system cannot provide." [*United States v*] *Chambers*, 395 F3d [563], at 577 (Sutton, J, dissenting) [(CA 6, 2005), abrogated *King*, 563 US at 462]. And even if an occupant chooses to open the door and speak with the officers, the occupant need not allow the officers to enter the premises and may refuse to answer any questions at any time. [*King*, 563 US at 469-470.]

This Court has described "the knock and talk procedure . . . [as] a law enforcement tactic in which the police, who possess some information that they believe warrants further investigation, but that is insufficient to constitute probable cause for a search warrant, approach the person suspected of engaging in illegal activity at the person's residence (even knock on the front door), identify themselves as police officers, and request consent to search for the suspected illegality or illicit items." *People v Frohriep*, 247 Mich App 692, 697; 637 NW2d 562 (2001).

Again, in this case, three officers in plain clothes arrived at Cornelius's home. Defendant went onto the porch, opened the outside screen door, and repeatedly knocked on the inner door. Sergeant Glaza walked up to Cornelius's vehicle and tried the door handle, reporting that the operator had shut off the alarm. Officer Lyons checked the west side of the home before he moved to the east side, walking past the side door and looking into the backyard. After Cornelius did not answer the door, defendant left the porch and walked over to peer into Cornelius's vehicle through a window. Defendant stated: "Oh that'd be a violation."[6] Sergeant Glaza reported that he was putting the plate in and further responded, "I'm pretty sure it will be." At that point, Cornelius opened the door to inquire what the three men were doing.

While certain actions taken by the officers were within the limited license discussed in *Jardines*, others were not. Moreover, one federal appellate court[7] has held that "[t]he 'knock and talk' exception to the warrant requirement does not apply when officers encroach upon the curtilage of a home with the intent to arrest the occupant." *US v Lundin*, 817 F3d 1151, 1160 (CA 9, 2016). The court reasoned that "the scope of a license is often limited to the purpose of asking questions of the occupants." *Id*. at 1159 (quotation marks and citation omitted). And although "reasonableness under the Fourth Amendment is predominantly an objective inquiry," in *Jardines*, the Supreme Court "explain[ed] that the scope of the license to approach a home and knock is limited not only to a particular area but also to a *specific purpose*." *Id*. at 1159-1160 (quotation marks and citations omitted; emphasis added). Thus, "the 'knock and talk, exception depends at least in part on an officer's subjective intent." *Id*. at 1160. Accordingly, "[j]ust as the background social norms that invite a visitor to the front door do not invite him there to conduct a search, those norms also do not invite a visitor there to arrest the occupant." *Id*. (quotation marks and citation omitted). The federal court:

---

[6] The violation was not further explained.

[7] Intermediate federal caselaw is not binding on this Court, "but may be relied on for its persuasive value." *People v DeRousse*, ___ Mich App ___, ___; ___ NW2d ___ (Docket No. 358358, rel'd May 5, 2022) (quotation marks and citation omitted).

We do not hold that an officer may never conduct a 'knock and talk' when he or she has probable cause to arrest a resident but does not have an arrest warrant. An officer does not violate the Fourth Amendment by approaching a home at a reasonable hour and knocking on the front door with the intent merely to ask the resident questions, even if the officer has probable cause to arrest the resident. [*Id.*]

But because the officer in *Lundin* had dispatch broadcast a request to arrest the suspect, and the officers dispatched arrived at 4 a.m. with that intent, they violated the suspect's "Fourth Amendment right to be free from unlawful searches when they stood on his porch and knocked on his front door." *Id.* In other words, "the officers' purpose in knocking on [the suspect's] door was to find and arrest him." Moreover, because their "unconstitutional conduct caused the allegedly exigent circumstance . . . [it could not] justify the search resulting in the seizure of" two weapons that the police found. *Id.*

In this case, the police purpose in going to the Pembroke home, where they believed Michael Hopkins lived, was to find and arrest him. Thus, whether questions would be asked presumably depended on who answered the door. If Hopkins answered, defendant testified that the police would arrest him, suggesting no questions would be asked.[8] If someone else answered, which in defendant's experience occurred most of the time, that person would try to get the police to leave. The questions to that person would be whether Hopkins was there, and, if that person would consent to the police entry. In this case, defendant asked if "Michael" was in Cornelius's house and Cornelius denied that he was. Defendant also told Cornelius that he needed to step inside and Cornelius replied that defendant did not because he did not have a warrant. After Cornelius shut the door, defendant attempted to shoulder it, and then kicked it in. Viewed in the light most favorable to the prosecution, defendant's actions violated the Fourth Amendment because he did not have a warrant, consent, or exigent circumstances.

## 2. WARRANTLESS ARRESTS

Fourth Amendment law is well-settled that "a warrantless arrest in a public place is valid if the arresting officer ha[s] probable cause to believe the suspect is a felon[.]" *Payton v New York*, 445 US 573, 590; 100 S Ct 1341; 63 L Ed 2d 639 (1980). See also *People v Hammerlund*, 504 Mich 442, 452; 939 NW2d 129 (2019) ("Warrantless arrests that take place in public upon probable cause do not violate the Fourth Amendment."). But, absent exigent circumstances, "the Fourth Amendment to the United States Constitution,[9] made applicable to the States by the Fourteenth

---

[8] As discussed in the next section, more is required than simply seeing the suspected felon inside his or her home.

[9] The Fourth Amendment of the United States Constitution provides:

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

Amendment,[10] . . . prohibits the police from making a warrantless and nonconsensual entry into a suspect's home in order to make a routine felony arrest." *Payton*, 445 US at 576, 583. On the other hand, an officer with "an arrest warrant founded on probable cause" has "the limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within." *Id*. at 603. See also *Kirk v Louisiana*, 536 US 635, 638; 122 S Ct 2458; 153 L Ed 2d 599 (2002) ("As *Payton* makes plain, police officers need either a warrant[11] or probable cause plus exigent circumstances in order to make a lawful entry into a home."). When, however, the subject of an arrest warrant is in the home of a third party, absent exigent circumstances or consent, the police cannot legally search for the subject without first obtaining a search warrant directing entry into the third-party's home. *Steagald v United States*, 451 US 204, 216; 101 S Ct 1642; 68 L Ed 2d 38 (1981).

In this case, defendant, a police officer for over seventeen years, had been trained on search and seizure law, and his duties included making felony arrests. According to defendant, PC initially provided two potential locations for Michael Hopkins, but she was adamant that he lived at the Pembroke address. Defendant testified that the Secretary of State listed that address for Hopkins alone.[12] Defendant admitted that the police did not obtain an arrest warrant for Hopkins. There was undoubtedly sufficient time to do so in the seven-week interval after PC first reported the home invasion, and even in the time between defendant's 10 a.m. meeting with PC on January 22 and the unmarked unit's arrival at Cornelius's home shortly before noon. Curiously, despite the officers acknowledging at trial that they did not have either an arrest warrant or a search warrant, Officer Lyons's bodycam footage showed that he repeatedly suggested otherwise during his subsequent conversation with Cornelius:

- You'd think we'd be in here if there was no warrant?[13]

---

Our state "Constitution, Const 1963, art 1, §11, provides coextensive protection to that of its federal counterpart." *Hammerlund*, 504 Mich at 451 n 3.

[10] The Due Process Clause of the Fourteenth Amendment of the United States Constitution incorporates the Fourth Amendment's protections as to the states. *Mapp v Ohio*, 367 US 643; 81 S Ct 1684; 6 L Ed 2d 1081 (1961).

[11] "[F]or Fourth Amendment purposes, an arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within." *Payton*, 445 US at 602.

[12] Again, Cornelius testified that he was positive that his driver's license, which he showed defendant, had the Pembroke address. See footnote 3.

[13] MCL 764.21 provides:

A private person, when making an arrest for a felony committed in his or her presence, or a peace officer or federal law enforcement officer, when making an arrest with a warrant or when making a felony arrest without a warrant as authorized by law, may break open an inner or outer door of a building in which the person to

- Michael's your brother[14] and he's using your address for his warrants. What the f*** do you think we're doing here?

- If you know the law, then you know we don't have to [show you] on an arrest warrant.

- The correct way is that if there's a known felon in here and we have an arrest warrant we're coming in straight. Period.

In any event, as already mentioned and as defendant testified at trial, the law permits the police to enter a home without a warrant if they have consent or when there are exigent circumstances. *Steagald*, 451 US at 216; *Payton*, 445 US at 576, 583.

### 3. CONSENT

When freely and voluntarily given, an individual's consent to a police search is valid. *Schneckloth v Bustamonte*, 412 US 218, 222; 36 L Ed 2d 854; 93 S Ct 2041 (1973). In this case, the bodycam video vividly depicted, and Cornelius's testimony confirmed, defendant did not have consent to enter Cornelius's home. The video showed that as defendant moved forward to enter Cornelius's home, he stated: "I need to step in. Is that okay?" Having already told defendant that he did not have a warrant, Cornelius replied, "No, no, you don't need to step in" as he shut the door. At trial, defendant admitted that Cornelius did not consent to the police entry and that Cornelius told defendant he could not enter the Pembroke home because he did not have a warrant.

Yet, while Officer Lyons was inside with Cornelius after the unsuccessful search for Hopkins, defendant approached Sergeant Glaza, who was standing in Cornelius's front yard. Defendant said: "Maybe he [Cornelius] opened the door?" Sergeant Glaza did not hear what defendant said, so defendant repeated it. In response, Sergeant Glaza shrugged and said: "Uh, I don't know about that[.]" Sergeant Glaza then added, "I don't think they're gonna give you . . . that." Defendant responded: "That's true." In other words, both Sergeant Glaza and

---

be arrested is located or is reasonably believed to be located if, after announcing his or her purpose, he or she is refused admittance.

Despite the statutory language, this Court recognizes that the Constitution requires consent, exigent circumstances, or a search warrant to apprehend a person named in an arrest warrant inside a third-party's home. See *People v Clement*, 107 Mich App 283; 309 NW2d 236 (1981).

The bodycam video in this case does not show that defendant ever informed Cornelius that the police intended to arrest Hopkins. Instead, it reflected that Officer Lyons asked Cornelius, "[D]o you want us to keep coming over and kicking in the door?" and then suggesting that other law-enforcement agencies might follow suit until "Michael either cooperates or figures it out."

[14] Hopkins was not Cornelius's brother. Confusion on this point arose after Officer Lyons questioned Cornelius about whether he had a brother named Michael. Cornelius had a brother named Michael—Michael McShan. Cornelius steadfastly maintained he did not know Michael Hopkins until they met inside the jail after their arrests.

defendant recognized that positing that Cornelius voluntarily opened the door and allowed the police to enter would not be credible when the bodycam video captured Cornelius denying them entry before defendant kicked open the door with such force that the deadbolt flew through the air. Because the police did not have a warrant and did not have consent, exigent circumstances were required for a lawful entry to arrest. *Steagald*, 451 US at 216; *Payton*, 445 US at 576, 583.

## 4. EXIGENT CIRCUMSTANCES

Although "searches and seizures inside a home without a warrant are presumptively unreasonable," "this presumption may be overcome in some circumstances because the ultimate touchstone of the Fourth Amendment is reasonableness." *King*, 563 US at 459 (quotation marks and citations omitted). "Accordingly, the warrant requirement is subject to certain reasonable exceptions." *Id*. "One well-recognized exception applies when the exigencies of the situation make the needs of law enforcement so compelling that a warrantless search is objectively reasonable under the Fourth Amendment." *Id*. at 460 (quotation marks, brackets, and citation omitted).

The United States Supreme Court "has identified several exigencies that may justify a warrantless search of a home." *Id*. One is "the 'emergency aid' exception, [permitting] 'officers [to] enter a home without a warrant to render emergency assistance to an injured occupant or to protect an occupant from imminent injury.'" *Id*. at 460, quoting *Brigham City v Stuart*, 547 US 398, 403; 126 S Ct 1943; 164 L Ed 2d 650 (2006). Others are "hot pursuit of a fleeing felon," "imminent destruction of evidence," "the need to prevent a suspect's escape, or the risk of danger to the police or to other persons inside or outside the dwelling." *Minnesota v Olson*, 495 US 91, 100; 110 S Ct 1684; 109 L Ed 2d 85 (1990) (quotation marks and citation omitted). "[I]n the absence of hot pursuit[,] there must be at least probable cause to believe that one or more of the other factors justifying the entry were present and that in assessing the risk of danger, the gravity of the crime and likelihood that the suspect is armed should be considered." *Id*. "Where, however, the arrest is planned in advance, it is less likely the police can claim exigent circumstances." *State v Olson*, 436 NW2d 92 (Minn, 1989), judgment aff'd 495 US at 95, 100-101.

Our Supreme Court has likewise recognized that:

> [w]hen the police act pursuant to the exigent circumstances exception, they are searching for evidence or perpetrators of a crime. Accordingly, in addition to showing the existence of an emergency leaving no time for a warrant, they must also possess probable cause that the premises to be searched contains such evidence or suspects. [*In re Forfeiture of $176,598*, 443 Mich 261, 270; 505 NW2d 201 (1993), quoting *People v Davis*, 442 Mich 1, 24; 497 NW2d 910 (1993).]

The circumstances are viewed objectively to determine whether they justify the police action. *King*, 563 US at 464. And "[t]he exigent circumstances rule applies when the police do not gain entry to [the] premises by means of an actual or threatened violation of the Fourth Amendment." *Id*.

Our Supreme Court has identified a number of factors that may be considered to determine whether an exigency exists. *People v Oliver*, 417 Mich 366, 383; 338 NW2d 167 (1983). They include:

> (1) whether a serious offense, particularly a crime of violence, is involved; (2) whether the suspect is reasonably believed to be armed; (3) whether there is clear showing of probable cause; (4) whether strong reason exists to believe the suspect is in the premises being entered; (5) whether there is a likelihood that the suspect will escape if not swiftly apprehended; (6) whether the entry is forcible or peaceful; and (7) whether the entry is at night. [*Id*. at 384 (quotation marks and citations omitted).]

Additional factors to be considered are:

> (1) preventing the destruction of evidence, (2) ensuring the safety of law enforcement personnel, (3) ensuring the safety of citizens, and (4) the ability to secure a warrant. In short, all these factors weigh in allowing action without warrants by police. Each case, however, must be judged on its own facts. [*Id*.]

At trial, defendant agreed that the emergency aid exception did not apply. Nor did this case involve hot pursuit necessary to apprehend a fleeing felon whom the police feared would destroy evidence if they failed to act quickly. See *Hammerlund*, 504 Mich at 461. To the contrary, the police had adequate time to obtain a warrant before they arrived at Cornelius's door while they ensured PC's safety. Defendant himself recognized that PC was not in danger inside the house.

Instead, the exigency defendant described involved the perceived threat of harm to the officers. Defendant believed Hopkins was inside the Pembroke home due to PC's reports, as corroborated by the Secretary of State, the presence of the white SUV of unknown make and model with an out-of-state license plate, and Cornelius's demeanor. On top of that, there was the barricading of the side door and defendant's claim that he thought Cornelius was "reach[ing] behind his back to get something," namely, "a weapon," even though he "didn't see it."

If true, I would agree with the majority that such a scenario constituted exigent circumstances. See *King*, 563 US at 470 ("Any warrantless entry based on exigent circumstances must, of course, be supported by a genuine exigency."). The jury, however, could reasonably determine it was not.[15]

The jury had the bodycam video and the opportunity to observe the witnesses as they testified. Beginning with defendant's testimony that the bodycam footage showed Cornelius reaching behind his back before he closed the door, the jury repeatedly watched the video and could reasonably determine that Cornelius reached back to close the door in full view of defendant,

---

[15] The trial court rejected defendant's pretrial motion, concluding there were no exigent circumstances.

-10-

not to retrieve any weapon.[16]  Likewise, the jury could reasonably credit Cornelius's testimony his side door was kept barricaded and he had not placed the barricade while the officers were outside. Again, the bodycam captured no sound of the "loud" thump Officer Lyons recounted.  The jury could also accept Cornelius's testimony that he spoke to no one while retrieving the keys to his vehicle in order to comply with defendant's request to sound the horn, especially given the conflict in the officers' versions.[17]  The jury could further reasonably credit Cornelius's testimony that his driver's license displayed the Pembroke address.  And the jury could reasonably decide Cornelius's demeanor was anything but "evasive."  On the videotape, Cornelius maintained he was the home's owner and he urged defendant to check the records.  Cornelius denied he knew "Michael" and said no one lived with him.  To appease defendant, Cornelius complied with his request to honk the vehicle's horn.  Thereafter, Cornelius asserted his Fourth Amendment rights, explaining that the police did not have a warrant.  *King*, 563 US at 470 ("And even if an occupant chooses to open the door and speak with the officers, the occupant need not allow the officers to enter the premises and may refuse to answer any questions at any time.").  Finally, as discussed more fully below, the jury could reasonably decide that defendant lied in his police report about what occurred at the Pembroke address.  It is well-established that "[a] jury may infer consciousness of guilty from evidence of lying or deception."  *People v Dixon-Bey*, 321 Mich App 490, 509-510; 909 NW2d 458 (2017) (quotation marks and citation omitted; alternation in original).

Making credibility determinations in support of the jury's verdict, a reasonable juror could conclude that defendant knowingly violated Cornelius's Fourth Amendment rights.  Without exigent circumstances, and immediately after Cornelius asserted his Fourth Amendment rights by denying defendant's request to enter Cornelius's home, defendant, who had no arrest or search warrant, kicked in Cornelius's door, causing hundreds of dollars in damage.  The three armed police officers charged inside and ordered Cornelius to get on the ground face down.  Cornelius asked what the police were doing, protesting that no one else was in his house, before being called a "dumb a**" and handcuffed.  Cornelius testified that he feared for his life, voicing his concern

---

[16] The trial court made this same determination in denying defendant's motion.  And defendant's claim that Cornelius was reaching for a weapon was further belied by defendant's testimony that he did not have an opportunity to warn his fellow officers about Cornelius's threatening motion or even the fact that Cornelius could be armed.  Yet, defendant's police report reflects that defendant feared Cornelius was going to arm himself upon closing the door, not that he was already armed and reaching for a weapon.  But, even after defendant's forcible entry, he did not immediately secure and search Cornelius for a weapon or warn his fellow officers Cornelius was armed.

[17] Officer Lyons claimed that he heard "kind of a quiet voice," that he "interpreted . . . as a conversation between two people[.]"  Defendant's police report, however, states that he could hear [Cornelius] loud talking and loud movements inside the house."  Initially, defendant testified that he heard someone say "they put something on the door, or something . . . about the back door," and later clarified that he deduced the side door was barricaded after he made entry and saw the barricade.

-11-

that the police would portray him as having had a weapon in his hand. Cornelius's mother, who lived across the street, became aware of what occurred and was visibly distraught.

Although apprehending Hopkins was a priority for defendant that day,[18] the Constitution controlled and constrained the actions he was permitted to take as a law enforcement officer to effectuate an arrest inside a home. In choosing to ignore the constitutional requirements and lying to legitimize his reasons for forcibly entering Cornelius's home after Cornelius expressly invoked his Fourth Amendment rights, the jury could reasonably conclude that defendant committed misconduct in office and acted with the requisite corrupt intent.[19]

## B. FALSE STATEMENTS IN A POLICE REPORT

The jury could also reasonably conclude that defendant committed misconduct in office when he made false statements in his police report about what occurred. *Coutu*, 459 Mich at 354 n 3; *Thomas*, 438 Mich at 451, 458 n 8. See also *Thomas*, 438 Mich at 460-462 (BOYLE, J., concurring).

Defendant's police report reads:

> [Defendant,] . . . working [in the] 8th precinct, Home Invasion Task Force, with Sergeant Paul Glaza and Police [O]fficer Justin Lyons, made the above location to attempt to arrest Michael Hopkins, black male, 8/8/76, of 22554 Pembroke for home invasion II.
>
> Per the complainant of the home invasion, and per SOS, Secretary of State, Mr. Hopkins resided at 22554 Pembroke. [Defendant] knocked on the front door several times with no answer.
>
> [Defendant] had information that [the] wanted individual [Hopkins] drives a rented, white, SUV. After receiving no answer at the door, [defendant] left the porch location and looked in the window of the white SUV, which was in the driveway.
>
> [T]he perp [homeowner Tashar Cornelius] came to the door as [defendant] was looking at the motor vehicle, and demanded to know what the [police] were there for. [The officers] identified [themselves] as Detroit police officers and displayed [the] badges on [their] chests. [The officers] asked the perp [Cornelius]

---

[18] The police continued to look for Hopkins at the second address PC provided. They encountered Hopkins driving down Glastonbury Street in a different white SUV with an out-of-state license plate and arrested him.

[19] Defendant's contention that he was simply following Sergeant Glaza's orders does not shield him because he was not required to obey an illegal or immoral order. And, viewed in the light most favorable to the prosecution, Sergeant Glaza had not responded to defendant's inquiry about what he should do and attempted to shoulder the door before Sergeant Glaza urged him to use his foot.

if the wanted person was inside. The perp [Cornelius] didn't deny that he was. [The police] explained that our information was that the wanted individual drives a white SUV. The perp [Cornelius] claimed that he rented the white SUV that was in the driveway.

[Defendant] requested that the perp [Cornelius] have the keys to the SUV, if he could click the keys and make the SUV['s] horn beep. The perp [Cornelius] closed the door, and the [police] heard him lock it. [Defendant] could hear [Cornelius] loud talking inside the house, and loud movements inside the house.

PO Lyons, who was standing by the side door heard what sounded like a piece of wood being put on the door to brace it from being opened. The horn on SUV in the driveway beeped a short time later.

[Cornelius] came back to the front door and opened it. [Defendant] tried to further inquire if there was anyone in the home, due to [defendant] hearing talking and movements inside the home. [Defendant] was standing on the porch in a tactical manner with [his] foot on the threshold. The perp [Cornelius] abruptly slammed the door on [defendant's] foot several times. The force of the door being slammed into [defendant's] foot, caused [defendant's] foot to be pushed out of the way, and the perp [Cornelius] locked the door.

[Defendant], after being assaulted and fearing that the perp [Cornelius] was going to harm [sic? arm] himself, [defendant] forced the front door open and gained control of the perp [Cornelius] in the living room area of the home.

The perp [Cornelius] was arrested for assaulting [defendant]. In plain view on a table in the living room, was a pink stun gun. [Defendant] recovered the stun gun after the perp [Cornelius] was taken into custody. During [defendant's] investigation, [defendant] checked the perp's [Cornelius's] name, and per [the Law Enforcement Information Network (LEIN)], the perp [Cornelius] was a convicted felon.

The jury, however, could reasonably conclude that the body camera footage refuted portions of defendant's police report (as well his trial testimony) in important respects. Significantly, Cornelius repeatedly and explicitly denied "Michael" or anyone else lived in the home, and Cornelius exercised his constitutional rights by insisting that the police needed a warrant to enter his home. Cornelius also denied barricading the door while the police were present, explaining that he had the barricade already in place for security. Although defendant described Cornelius as talking loudly, Officer Lyons described the conversation as quiet while Cornelius denied it ever occurred. Officer Lyons further admitted that the bodycam footage did not capture the "loud thump" he claimed to have heard that indicated to him a barricade was being placed.[20]

---

[20] Officer Lyons claimed he "was pretty confident that's what [was] going on."

The videotape further refuted defendant's claim that he assumed a tactical stance and that Cornelius assaulted him by repeatedly slamming his foot in the door.

From Cornelius's perspective, three Caucasian adult males were wandering around his property.[21] Defendant knocked on Cornelius's door before walking over to peer into the window of Cornelius's vehicle parked in the driveway.[22] Cornelius then opened the door and commented that they were "looking at my car out there." Cornelius inquired, "Man, you all wanna tell me what you all doing out there?" It is difficult to hear defendant's reply, but defendant then asked, "What's your name?" Cornelius told him and defendant asked if the car was his. Cornelius reiterated that it was. Defendant informed Cornelius that he needed to speak with someone, namely Michael.[23] Cornelius inquired "Michael who?" Defendant then asked for Cornelius's identification. Cornelius responded: "You're bothering me about a car. Banging on my door about a guy that's not even here, right?" Defendant said that he did not know who Cornelius was, and Cornelius replied that he owned the house.

As the discussion continued, Cornelius informed defendant that he had lived in the house "[l]ong enough" and did not know Michael. Defendant told Cornelius, "Michael's mother lives here," and Cornelius suggested defendant should "[d]o the research." Defendant retorted that he did. Thereafter, Cornelius asked defendant "[a]nd what does the house say?" Defendant responded that he was giving Cornelius "way too much information as is." Cornelius insisted "[b]ecause the house is in my name" and "[t]here is no Michael that lives here."

Defendant then asked Cornelius to "just click" the vehicle if it was his. Cornelius agreed, saying "Okay. I understand you, sir." Cornelius closed and locked his front door.

Defendant stated: "He's [Michael's] in this house." Sergeant Glaza agreed.

Officer Lyons, who was positioned in the rear corner of Cornelius's house, past the side door, indicated to Sergeant Glaza there was a person in the area of the side door. Sergeant Glaza asked if he tried to get out and told Officer Lyons to try the door knob on the side door. Officer Lyons did so and informed Sergeant Glaza that the side door was locked.

From inside his house, Cornelius then sounded the car horn twice. Defendant opined: "Yeah, after he got the keys from Michael, he clicked it."

Cornelius opened the inner door and tried to shut the security door that defendant had opened after Cornelius had gone inside, prefacing this action with "Sir, excuse me." Cornelius added: "[Y]ou don't have a warrant, sir, so." Nevertheless, defendant said he "need[ed] to step

---

[21] Again, all three officers were in plain clothes and arrived in an unmarked vehicle.

[22] The videotape shows that Sergeant Glaza had already tried to open the driver's side door of the vehicle.

[23] Defendant had a picture of Michael Hopkins with him.

in" and asked "Is that okay?" Cornelius replied that defendant did not and defendant interjected before Cornelius repeated himself and closed the door.

After defendant kicked in Cornelius's door, defendant and Sergeant Glaza thoroughly searched Cornelius's home and its curtilage for Hopkins without success. Sergeant Glaza also searched Cornelius's vehicle in the driveway without success. But the police discovered a marijuana grow operation in Cornelius's basement for which Cornelius had an expired card and a pink stun gun that he had purchased for his girlfriend.[24]

Sergeant Glaza suggested that Cornelius would be arrested for lying to the police. Defendant contacted others for assistance to run Cornelius's name and birthdate through the system. Defendant learned that Cornelius had a felony record and told Sergeant Glaza, "We got felon in possession." Sergeant Glaza replied: "No s***."

Thereafter, defendant discussed with Sergeant Glaza the possibility that Cornelius opened the door to the police. Both agreed that scenario would not fly. Later still, the bodycam captured a conversation defendant had with Officer Lyons. Defendant asked that the officers talk among themselves in the event they had to go to court. Officer Lyons was agreeable and asked what criminal charge defendant thought would work. Defendant proposed "going with obstruction."[25] Their discussion continued before Sergeant Glaza approached and informed them that he told Cornelius he was arrested for knowingly and willfully making a false or misleading statement to a police officer regarding a material fact in a criminal investigation after being informed that peace officer was conducting a criminal investigation, MCL 750.479c(b),[26] and possession of a stun gun, MCL 28.224a.[27]

---

[24] The stun gun was on the table inside Cornelius's living room and not visible from the doorway.

[25] At trial, Officer Lyons testified that he did not recall any discussion between the officers at the scene about the basis for Cornelius's arrest.

Defendant's police report identified an assault and battery as the basis for Cornelius's arrest. At trial, however, defendant testified that while the assault was the reason Cornelius was detained, felon-in-possession was the reason for his arrest. According to defendant, a felon-in-possession charge was not an available option on the system used to prepare his report. Defendant did not know if there was an available category for firearms offenses and opined that the category for weapons offenses required an act like shooting someone.

[26] Presumably the false statement was that Cornelius did not know "Michael" when defendant initially inquired. At trial, defendant contended that Cornelius actually knew Michael Hopkins and lied to the police about their relationship. Cornelius testified that he did not know Michael Hopkins and met him only after both were arrested and housed in the same jail cell. However, Cornelius admitted that he had received mail addressed to Hopkins in 2015 and discarded it.

[27] Contrary to defendant's earlier statement that a potential criminal charge was felon in possession of a firearm, MCL 750.224f, as well as defendant's and Officer Lyons's testimony that Cornelius was arrested for that crime, a stun gun is not a firearm. See MCL 750.222(e) (a " '[f]irearm' means

-15-

Defendant then inquired whether they were "good," referencing the body cameras. The officers turned off their cameras and returned to the precinct to prepare their reports.

In the interim, additional officers arrived and transported Cornelius to jail in a marked police car. Thirty-six hours later, Cornelius was released. No criminal charges were authorized.

As a seasoned officer, defendant knew his police report would be submitted to the prosecutor to request criminal charges against Cornelius. See MCL 750.224a(4) (unlawful possession of a stun gun is four-year felony); MCL 750.479c(2)(d) (knowingly making a false or misleading statement regarding a material fact after being informed that a peace officer is conducting a criminal investigation is a two-year misdemeanor). Defendant also knew that the unlawful entry into Cornelius's home would require suppression of any evidence seized. See *Wong Sun v United States*, 371 US 471, 485; 83 S Ct 407; 9 L Ed 2d 441 (1963). Viewing all of this evidence just discussed in the light most favorable to the prosecution, a rational jury could conclude that defendant committed misconduct in office with the requisite corrupt intent when he wrote false statements in his police report regarding law enforcement's unlawful forcible entry into Cornelius's home.

## II. JUDICIAL MISCONDUCT

"One form of judicial bias is biased commentary in front of the jury." *People v Willis*, 322 Mich App 579, 590; 914 NW2d 384 (2018). As this Court recently explained:

> A trial judge has broad, but not unlimited, discretion when controlling the court's proceedings. The overriding principle is that a court's actions cannot pierce the veil of judicial impartiality. Invading the prosecutor's role is a clear violation of this tenet. The trial court, pursuant to MRE 614(b), may question witnesses in order to clarify testimony or elicit additional relevant information. However, the trial court must exercise caution and restraint to ensure that its questions are not intimidating, argumentative, prejudicial, unfair, or partial. The test to determine whether a trial judge's conduct pierces the veil of impartiality, thereby violating the constitutional guarantee of a fair trial, is whether, when considering the totality of

---

any weapon which will, is designed to, or may readily be converted to expel a projectile by action of an explosive."). MCL 750.224a prohibits the possession of "a portable device or weapon from which an electrical current, impulse, wave, or beam may be directed, which current, impulse, wave, or beam is designed to incapacitate temporarily, injure, or kill," except under certain circumstances. One of those circumstances requires that a person have a license to carry a concealed weapon (CCW), MCL 750.224a(2)(b), and a person who is prohibited from possessing firearm, like a convicted felon, is not eligible to apply for a CCW permit, MCL 28.422(3)(e). After Cornelius was inside the police car, Sergeant Glaza said that he supposed he should ask him whether his rights to possess a firearm had been restored. Even though they had not, it remains an open question "whether the prohibition on home possession [of such a device or weapon without a] permit [to carry a concealed weapon] will withstand a constitutional challenge . . . ." See Gillespie, Michigan Law & Procedure §5:609, citing *Caetano v Massachusetts*, 577 US 411; 136 S Ct 1027; 194 L Ed 2d 99 (2016); *People v Yanna*, 297 Mich App 137; 824 NW2d 241 (2012).

the circumstances, it is reasonably likely that the judge's conduct improperly influenced the jury by creating the appearance of advocacy or partiality against a party.

> This inquiry requires a fact-specific analysis. A single inappropriate act does not necessarily give the appearance of advocacy or partiality, but a single instance of misconduct may be so egregious that it pierces the veil of impartiality. Ultimately, the reviewing court should not evaluate errors standing alone, but rather consider the cumulative effect of the errors.

Because a reviewing court is to look at the totality of the circumstances,

> the reviewing court should inquire into a variety of factors, including [(1)] the nature of the judicial conduct, [(2)] the tone and demeanor of the trial judge, [(3)] the scope of the judicial conduct in the context of the length and complexity of the trial and issues therein, [(4)] the extent to which the judge's conduct was directed at one side more than the other, and [(5)] the presence of any curative instructions. [*People v Boshell*, 337 Mich App 322, 447; 975 NW2d 72 (2021), quoting *People v Stevens*, 498 Mich 162, 171-172; 869 NW2d 233 (2015) (quotation marks and citations omitted).]

On appeal, defendant challenges the following exchange that occurred between the trial court and Officer Lyons:

*The Court*: [Officer] Lyons, why did you try to open the side door?[28]

*The Witness*: I was trying to see if it was locked, if the door was locked.

*The Court*: Why?

*The Witness*: Just as a -- a potential entry point had we needed to make entry.

*The Court*: Without a warrant, okay.

*The Witness*: Well, I'm not saying that I was --

*The Court*: Without a warrant.

---

[28] Both Sergeant Glaza's and Officer Lyons's bodycam video showed that Sergeant Glaza directed Officer Lyons "to try" the side door, inquiring whether it was locked. Officer Lyons turned the door knob and confirmed Cornelius's side door was locked.

*The Witness*: I'm sorry, your Honor. Well, in case we had to get a warrant or to see if it was unlocked.[29]

*The Court*: Okay, but, you did not get a warrant in this particular case, correct?

*The Witness*: Correct, we did not get a warrant.

*The Court*: With regard to the white vehicle that was in the parking lot, did you have the capacity to run that vehicle?

*The Witness*: No, Your Honor, not at that point.

*The Court*: Your scout car did not have any computer in the car to run the vehicle?

*The Witness*: Correct.

*The Court*: But, you ran Mr. Cornelius's name to determine whether or not he had a record, you were able to do that, correct?

*The Witness*: I don't know if that was a phone call made after, or prior to.

*The Court*: But, a phone call could have been made to run the vehicle that was in the driveway, correct?

*The Witness*: Yes, but in -- [30]

*The Court*: Yes, thank you. [Defense counsel]?


With regard to the first factor, the nature of the judicial conduct at issue is the trial court judge's questioning of Officer Lyons. Questioning witnesses is generally permitted, but with boundaries. *Stevens*, 498 Mich at 174. "[I]t is appropriate for a judge to question witnesses to produce fuller and more exact testimony or elicit additional relevant information." *Id*. at 173. However, "it is not the role of the court to impeach a witness or undermine a witness's general credibility." *People v Swilley*, 504 Mich 350, 373; 934 NW2d 771 (2019). "A judge's responsibilities do not include emphasizing or exposing potential weaknesses in a witness's testimony or conveying the judge's personal view on whether a witness should be believed." *Id*.

---

[29] Upon further questioning, Officer Lyons explained that checking the side door provided information about whether police entry was possible through the side door. Such information could also be used to obtain a warrant if "something major happen[ed]," like shots being fired in front of the house. The decision of whether a warrant was necessary was Sergeant Glaza's alone.

[30] In Sergeant Glaza's bodycam video, as defendant peered into the window of Cornelius's van, he remarked about a violation. Sergeant Glaza told defendant he was "putting the plate in . . . ." Cornelius then opened his front interior door, interrupting that process.

"Questions from a judge that are designed to emphasize or expose incredible, unsubstantiated, or contradictory aspects of a witness's testimony are impermissible." *Id*. at 374.

In this case, the trial court claimed that it was merely clarifying the issues regarding Officer Lyons attempting to open the side door and the officers' failure to run the license plate on the white SUV in the driveway. The record established that these two points were not fully explored during direct examination or cross-examination of Officer Lyons. Thus, clarification by the trial court judge was appropriate. Nevertheless, the trial court emphasized the fact that the officers did not have a warrant when Officer Lyons attempted to open the side door and, in doing so, the court expressed its belief that such conduct was improper. While the prosecution suggests that this did not place defendant in a negative light, I disagree. It is true that Officer Lyons was called as a witness by the prosecution and the trial court's question specifically referred to Officer Lyons's attempt to open the side door. But the trial court's belief that Officer Lyons should have had a warrant to open the side door necessarily reflected a belief that a warrant was required to open the front door as well. Therefore, this factor weighs in favor of finding that the trial court judge demonstrated the appearance of partiality.

With regard to the trial court judge's tone, review of the transcript supports defendant's assertion that the trial court judge's tone was argumentative and hostile. At one point, the trial court judge emphasized that Officer Lyons had acted "without a warrant," without even posing a question. The trial court judge's hostile tone is also apparent from the manner in which she cut off Officer Lyons's testimony at the end of the exchange. Trial counsel's objection noted the inappropriate tone, alleging that the trial court judge had "sounded like a Prosecutor." While trial counsel's statement should not be considered dispositive of the trial court judge's tone, it is supported by the record in this case. Thus, this factor weighs in favor of finding impermissible partiality.

With regard to the scope of the intervention, the trial court's entire questioning of Officer Lyons was brief, comprising less than two transcript pages of more than 190 pages of testimony. Further, as discussed above, there was a legitimate need to clarify at least one of the points. This factor weighs against finding impermissible partiality by the trial court judge.

With regard to the fourth factor, defendant challenges only this single exchange and does not assert that the trial court made any other biased remarks or conduct. The prosecutor points to some comments made by the trial court that could potentially be viewed as defense-friendly. Accordingly, there is not an obvious or strong imbalance in the trial court's action, and, therefore, this factor weighs against finding impermissible partiality.

Finally, defendant did not request a curative instruction. At the end of trial, however, the trial court instructed the jury that it if it believed that the trial court had an opinion about how it should decide the case, it "must pay no attention to that opinion." "[J]urors are presumed to follow their instructions[.]" *Stevens*, 498 Mich at 190 (quotation marks and citation omitted). Thus, this factor weighs against finding judicial bias.

In considering the totality of the circumstances, the judicial intervention was not entirely unnecessary, but went beyond mere clarification and displayed the trial court judge's personal view regarding the officers' conduct. Nonetheless, the intervention was brief and there was no

clear imbalance in the trial court judge's conduct throughout trial. The court also instructed the jury to disregard any opinion that it believed the court may have. Moreover, the fact that defendant was acquitted of the most serious charge suggests that any judicial bias did not improperly influence the jurors. *People v Biddles*, 316 Mich App 148, 156; 896 NW2d 461 (2016). Accordingly, defendant has not demonstrated that the trial court judge's conduct deprived him of a fair trial.

## III. PROSECUTORIAL ERROR[31]

"[T]he test for prosecutorial misconduct is whether a defendant was denied a fair and impartial trial." *People v Dobek*, 274 Mich App 58, 63; 732 NW2d 546 (2007). "Issues of prosecutorial misconduct are decided case by case, and this Court must examine the entire record and evaluate a prosecutor's remarks in context." *Id*. at 64. "A prosecutor's comments are to be evaluated in light of defense arguments and the relationship the comments bear to the evidence admitted at trial. Otherwise improper prosecutorial conduct or remarks might not require reversal if they address issues raised by defense counsel." *Id*. at 64 (citations omitted). "Prosecutors have discretion on how to argue the facts and reasonable inferences arising therefrom, and are not limited to presenting their arguments in the blandest terms possible." *People v Meissner*, 294 Mich App 438, 456; 812 NW2d 37 (2011). This Court "cannot find error requiring reversal where a curative instruction could have alleviated any prejudicial effect. Curative instructions are sufficient to cure the prejudicial effect of most inappropriate prosecutorial statements, and jurors are presumed to follow their instructions." *People v Unger*, 278 Mich App 210, 235; 749 NW2d 272 (2008) (quotation marks and citations omitted).

"[I]t is improper for a prosecutor to appeal to the jury's civic duty by injecting issues broader than guilt or innocence or encouraging jurors to suspend their powers of judgment." *People v Thomas*, 260 Mich App 450, 455-456; 678 NW2d 631 (2004) (citation omitted). "This type of argument unfairly places issues into the trial that are more comprehensive than a defendant's guilt or innocence and unfairly encourages jurors not to make reasoned judgments." *People v Abraham*, 256 Mich App 265, 273; 662 NW2d 836 (2003). But when a prosecutor argues that the crime has been established beyond a reasonable doubt, such a remark does "not constitute an assertion of personal belief by the prosecutor in defendant's guilt or an argument that the jury should convict the defendant regardless of the evidence." *People v Matuszak*, 263 Mich App 42, 56; 687 NW2d 342 (2004).

Defendant challenges the following statements made by the prosecutor during closing argument:

- "[Y]ou would hope that that person that we trust to do this, would follow the law, would follow the Constitution of the United States[.]"

---

[31] A fairer label for most claims of prosecutorial misconduct would be "prosecutorial error," while only the most extreme cases rise to the level of "prosecutorial misconduct." *People v Cooper*, 309 Mich App 74, 87-88; 867 NW2d 452 (2015).

-20-

- "We trust our police officers to know they cannot do certain things without a warrant . . . . [T]hey should be the first line of defense in making sure that our rights are not violated in some kind of way . . . . That's not what we want from our police officers in our community. That's not how we want to be policed. We want them to stop and think about the consequences. We want them to stop and protect the rights of all of the individuals . . . . [I]t is what we should want to weed out from our police officers. That is not the type of police officer that we want out in the field[.]"
- "How long has he been operating this way?"
- "[T]hey need to be responsible for it, which is why you must return a verdict of guilty[.]"

Contrary to defendant's assertion, the prosecutor did not expressly argue that the jury should convict defendant in order to hold law enforcement accountable and send a message to police officers. Rather, viewed as a whole and in context, the prosecutor argued that *defendant and the officers involved in this case* should be held accountable for their conduct in this case. Because the prosecutor expressly argued that the jury should convict defendant on the basis of the evidence, his argument was not improper. See *Matuszak*, 263 Mich App at 56. The prosecutor's arguments were also responsive to the defense theory that defendant was merely doing what any police officer would do. Furthermore, any prejudice was cured by the trial court's instructions that the jury had to decide the case on the basis of the evidence and that the attorneys' arguments were not evidence. See *Thomas*, 260 Mich App at 456 ("Once again, to the extent that the prosecutor's comments crossed the line into a civic duty argument, any minimal prejudice was cured by the trial court's instructions that the jury had to decide the case on the evidence and that the remarks of counsel were not evidence.").[32]

Finally, trial counsel was not ineffective by failing to object to the prosecutor's arguments, which were not improper, because an objection would have been futile. See *Thomas*, 260 Mich App at 457. Furthermore, counsel's decision not to object may be a matter of trial strategy, *Unger*, 278 Mich App at 242-243, and, even if trial counsel's performance was deficient, there was no prejudice because the trial court's instructions cured any error. *Thomas*, 260 Mich App at 457; *Unger*, 278 Mich App at 243.

## IV. UNANIMITY INSTRUCTION

Defendant contends that the trial court plainly erred by failing to instruct the jury that to convict defendant of misconduct in office it must unanimously agree on the act found to support the charge. In the alternative, defendant argues that trial counsel was ineffective by failing to request a specific unanimity instruction. I disagree.

---

[32] This case is unlike the case cited by defendant, *People v Humphreys*, 24 Mich App 411, 419-420; 180 NW2d 328 (1970), where this Court concluded that the prosecutor's improper expression of his belief that the defendant was guilty could not be cured by an instruction.

"A defendant has the right to a unanimous verdict and it is the duty of the trial court to properly instruct the jury on this unanimity requirement." *People v Waclawski*, 286 Mich App 634, 679; 780 NW2d 321 (2009) (quotation marks and citation omitted). A general unanimity instruction is generally sufficient. *Id.* But a specific unanimity instruction is required when the prosecution offers evidence of alternative acts allegedly committed by the defendant, and the alternative acts are materially distinct or there is reason to believe that the jurors might be confused or disagree about the factual basis of the defendant's guilt. *Id.* As stated by this Court in *People v Bailey*, 310 Mich App 703, 719; 873 NW2d 855 (2015):

> [A] specific unanimity instruction is not required in *all* cases in which more than one act is presented as evidence of the actus reus of a single criminal offense. [W]here materially identical evidence is presented with respect to each act, and there is no juror confusion, a general unanimity instruction will suffice. [Quotation marks and citations omitted.]

In this case, the trial court instructed the jury that "[a] verdict in a criminal case must be unanimous," meaning that it was "necessary that each of you agrees on that verdict." Thereafter, the court asked if the attorneys were "satisfied with the jury instructions as provided . . . ." Defense counsel affirmed he was. Thus, any claim that the trial court erred in failing to provide a specific unanimity instruction is waived. *People v Spaulding*, 332 Mich App 638, 653; 957 NW2d 843 (2020) ("A party's explicit and express approval of jury instructions as given waives any error and precludes appellate review.").

Turning to defendant's alternative argument that trial counsel was ineffective by failing to request the specific unanimity instruction, defendant has not met his dual burden of demonstrating counsel performed deficiently and that he was prejudiced. Assuming that a specific unanimity instruction was warranted because the prosecutor argued that defendant was guilty of misconduct in office if he lied in his police report apart from the unlawful police entry, there is no reasonable probability that this instruction would have changed the outcome of the trial. The jury found defendant guilty of breaking and entering and, thus, unanimously found that defendant unlawfully entered Cornelius's home, necessarily finding that defendant had intentionally violated his Fourth Amendment rights. Accordingly, defendant has not established he was prejudiced by counsel's failure to request a specific unanimity instruction regarding the misconduct in office charge.

For these reasons, I would affirm defendant's convictions.


/s/ Anica Letica

-22-